JOHN R. SAND AND GRAVEL
CO., Plaintiff,

v.

The UNITED STATES, Defendant.

No. 02–509 L.

United States Court of Federal Claims.

June 27, 2003.

Jeffrey K. Haynes, Bloomfield Hills, MI, for plaintiff. L. Rider Brice, III, Bloomfield Hills, MI, of counsel.

John S. Most, with whom was Thomas L. Sansonetti, Assistant Attorney General, Environment and Natural Resources Division, U.S. Department of Justice, Washington, DC, for defendant. Peter Felitti, Washington, DC, of counsel.

## OPINION AND ORDER

HEWITT, Judge.

This case is before the court on defendant's motion for judgment on the pleadings

or, in the alternative, for summary judgment. Plaintiff (John R. Sand or plaintiff) seeks compensation for defendant's physical taking of plaintiff's property during the environmental remediation of an adjacent landfill site. *See* Complaint (Compl.) at 1, 9–13.[1]

## I. Background[2]

In 1969, plaintiff entered into a 50–year lease for a 158–acre tract of land in Metamora Township, Lapeer County, Michigan, for the purpose of mining and marketing sand, stone, and gravel. *See* Compl. at 2; Def.'s Mot. at 3. The Metamora Landfill Site (Landfill), is a contaminated landfill located in the northern portion of the plaintiff's leasehold property (Property). *See* Compl. at 3; Def.'s Mot. at 3.[3]

The Michigan Department of Natural Resources (DNR) began investigations at the Landfill in 1981 following the discovery of drums containing hazardous waste. Def.'s Mot. at 3. In 1984, the Environmental Protection Agency (EPA) placed the Landfill on its "National Priority List" of hazardous waste sites, pursuant to the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 U.S.C. §§ 9601–9675 (1995). Def.'s PFUF ¶ 2.

In February 1986, EPA completed a Site Characterization Report for the Landfill and by August 1986, a Phased Feasibility Study was completed. *See* Compl. at 4. A Record of Decision (ROD) was signed by the Regional Administrator of EPA on September 1, 1986 (First ROD). *Id.* The First ROD contains remedial action plans for the south central portion of the Landfill (area 1) and the northwest portion of the Landfill (area 4). *Id.* By March 1989, EPA had completed a Remedial Investigation of the Landfill, which included the taking of soil samples and the installation of monitoring wells. *Id.* Some of this soil sampling and well installation occurred in areas of the Property that are not within the Landfill. *Id.*

A second ROD for final remedial action was issued in September 1990 (Second ROD). *Id.* The Second ROD called for a cap over the northern portion of the Landfill (Landfill Cap), a pump and treat system for contaminated liquids, and deed restrictions over the Landfill. Pl.'s Opp. at 3. It did not, however, provide a metes and bounds description of the Landfill Cap, indicate when construction of the Landfill Cap would begin, or exclude plaintiff from any portion of its leasehold. Pl.'s Suppl. Br. at 3–4. EPA continued remedial activities during the following two years, including the construction of a con-

1. The court has before it Defendant's Motion for Judgment on the Pleadings, or, in the Alternative, for Summary Judgment, and Memorandum in Support Thereof (Def.'s Mot.); Plaintiff's Memorandum in Opposition to Defendant's Motion for Judgment on the Pleadings, or, in the Alternative, Motion for Summary Judgment (Pl.'s Opp.); Defendant's Reply in Support of its Motion for Judgment on the Pleadings or, in the Alternative, for Summary Judgment (Def.'s Reply); Defendant's Proposed Findings of Uncontroverted Fact (Def.'s PFUF); Plaintiff's Responses to Defendant's Proposed Findings of Uncontroverted Fact (Pl.'s PFUF Resp.); Plaintiff's Additional Proposed Findings of Uncontroverted Fact (Pl.'s PFUF); Defendant's Responses to Plaintiff's Proposed Findings of Uncontroverted Fact (Def.'s PFUF Resp.); Defendant's Supplemental Briefing in Support of its Motion for Judgment on the Pleadings, or, in the Alternative, for Summary Judgment (Def.'s Suppl. Br.); and Plaintiff's Supplemental Brief on the Accrual of a Physical Taking Claim (Pl.'s Suppl. Br.).

2. Facts cited to the filing of only one party do not appear to be in dispute.

3. Plaintiff's Property is rectangular in shape and contains an access road running north-south slightly west of its center. *See* Pl.'s Opp. Exhibit (Ex.) 6 (detailed map of Property). Plaintiff's primary operations area is located in the center of the Property and just to the east of the access road. *See* Pl.'s Suppl. Br. Ex. 20 (map indicating operations area). The operations area consists of a garage, an electrical shed, a storage shed, a crushing and wash plant, a supply pond, customer access roads, and a surge pile. *Id.; see also* Pl.'s Opp. Ex. 6 (detailed map of Property); Transcript of Oral Argument (Tr.) Feb. 19, 2003, at 27–28; Compl. at 3–4. Plaintiff refers to this area as its "plant area." (Plant Area). Compl. at 4. The surge pile is on the southern end of the Plant Area. *See* Pl.'s Opp. Ex. 6. A sand and gravel pit is located to the southeast of the Plant Area. *See id.;* Pl.'s Suppl. Br. Ex. 20. Sand and gravel is moved northwest from the pit to the surge pile by a conveyor belt. Tr. at 29; Pl.'s Opp. Ex. 6. From there, another conveyor belt conveys the sand and gravel from the top of the surge pile north to the crushing and wash plant. *Id.*

crete storage pad[4] to the east of the supply pond and the installation of additional monitoring wells on various portions of the Property. Def.'s Suppl. Br. at 2; *see* Pl.'s Suppl. Br. Exhibit (Ex.) 20.

In or about 1992, EPA and its agents mobilized to remove barrels and contaminated material from the Landfill. Compl. at 4. EPA demanded and acquired access to the Property in order to perform these removal operations. *Id.* EPA erected fences in plaintiff's plant area (Plant Area) during the winter of 1992–1993. *Id.; see* Compl. Ex. 7 (map indicating fencing activities on the Property).[5] The impact of these fences on plaintiff's access to the Property and the legal consequences of that impact are at the center of this dispute. It is clear that the fences temporarily prevented plaintiff from operating its machinery and selling finished products to customers. Compl. at 4–5; Pl.'s Opp. at 5. Defendant argues that this exclusion was sufficiently permanent to effect the accrual of a taking, thereby time-barring plaintiff's present takings claim. Def.'s Mot. at 4–5; Def.'s Suppl. Br. at 7. However, following protests from plaintiff, EPA opened its gate to plaintiff and relocated the fences to areas outside plaintiff's Plant Area. Def.'s Mot. at 5; Pl.'s Opp. Ex.17 ¶ 6 (Declaration of Edward W. Evatz, Jr.) (Evatz Decl.). Plaintiff subsequently continued its mining and gravel operations on portions of the Property. Evatz Decl. ¶ 4.[6]

While plaintiff continued to use the Property, plaintiff's counsel wrote a series of letters to defendant from 1992–1994 asserting plaintiff's property rights and entitlement to "just compensation." *See* Def.'s Ex. 4–8.

These letters had little effect on defendant's remedial actions on the Property. In February 1994, EPA installed an additional fence in plaintiff's Plant Area south of plaintiff's supply pond. Pl.'s Opp. at 5. This fence temporarily deprived plaintiff of access to its pond and stockpile areas. *Id.* EPA removed this fence in the summer of 1994, at which time plaintiff restarted its water supply well and used it continuously thereafter. Evatz Decl. ¶ 8.

On August 28, 1996, EPA amended the Second ROD (1996 Amendment). Compl. at 5. The 1996 Amendment provides that contaminated soil excavated from a portion of the Landfill be consolidated with other waste material from the Landfill and redeposited on the Landfill under the Landfill Cap. *Id.* The 1996 Amendment did not define the area to be covered by the Landfill Cap nor did it describe any related area to which access would be barred. Pl.'s Suppl. Br. at 5.

On December 18, 1996, EPA issued an Administrative Order (Administrative Order), No. 97–C–379, to plaintiff. Compl. at 6. The Administrative Order became effective on January 8, 1997, 21 days after its issuance. *Id.* It requires plaintiff to grant EPA and its agents, subcontractors, consultants, and representatives entry and access to all portions of the Property for all activities that EPA asserts are necessary to complete actions required under the Consent Decree.[7] *Id.* (citing Compl. Ex. 2, Administrative Order ¶ 6.a). The Administrative Order forbids plaintiff from interfering with or impeding the selected remedy, including access roads, components of the groundwater treatment

---

**4.** EPA used the storage pad to facilitate the excavation and removal of drums of hazardous waste and contaminated soil by storing them there for pickup. Def.'s Suppl. Br. at 7. EPA abandoned the storage pad in 1994, and since then plaintiff has made "full use" of it. Pl.'s Opp. Ex. 17 ¶ 9 (Declaration of Edward W. Evatz, Jr.) (Evatz Decl.).

**5.** The fences enclosed approximately sixty percent of the Property, including most of the Property lying east of the access road. *See* Compl. Ex. 7. They closed off all of the Plant Area as well as the sand and gravel pit. Evatz Decl. ¶ 6. The fences also temporarily prevented plaintiff from accessing or engaging in mining activities in the

area containing the Landfill. Def.'s Mot. at 5; (citing Def.'s Mot. Ex. 3 ¶ 2 (Declaration Linda M. Nachowicz) (Nachowicz Decl.)); *see also* Compl. Ex. 7.

**6.** On March 17, 1993, EPA and a group of defendants (Settling Defendants) entered into a consent decree (Consent Decree) in the action *United States v. BASF–Inmont Corp.*, No. 91–CV–40320–FL (E.D. Mich. Mar. 17, 1993). *See* Compl. at 5. Plaintiff is not a party to the Consent Decree. *Id.* In the Consent Decree, Settling Defendants agreed to perform the remediation of the Landfill. Compl. at 5.

**7.** *See supra* note 6.

system, and fencing. *Id.* at 7 (citing Compl. Ex. 2, Administrative Order ¶ 6.d). It also defines by metes and bounds the area containing the Landfill Cap (the Area of Institutional Controls) [8] and prohibits plaintiff from interfering with the Area of Institutional Controls by excavating, grading, filling, drilling, drilling, mining, storage, disposal, or other construction or development. *Id.* (citing Ex. 2, Administrative Order ¶ 6.g); Pl.'s Suppl. Br. at 6. Plaintiff, under threat of a $25,000 a day penalty for noncompliance, agreed to comply with the Administrative Order and ceased all mining activity in the Area of Institutional Controls. Compl. at 7. At the time that EPA issued the Administrative Order, plaintiff was mining within the Area of Institutional Controls. *Id.;* Evatz Decl. ¶ 10.

Pursuant to the Administrative Order, EPA immediately began more extensive work at the Landfill and on the Property, including running hundreds of gravel trucks carrying fill for the Landfill Cap through plaintiff's Plant Area. Compl. at 7. On June 11, 1997, plaintiff's president and its counsel walked the Landfill and took pictures showing portions of the Area of Institutional Controls. Pl.'s Opp. at 7. Disputes arose among the parties relating to the plaintiff's compliance with the Administrative Order. Compl. at 8. On March 23, 1998, the United States District Court for the Eastern District of Michigan entered an order enjoining plaintiff from interfering with entry by EPA, its contractors and representatives onto the Landfill or the Property. *Id.* A fence, begun on April 27 and completed on May 12, 1998, was installed around the Area of Institutional Controls, enclosing approximately 42 acres of plaintiff's 158–acre leasehold. *See* Pl.'s Opp. at 7; Pl.'s PFUF ¶ 31. This fence completely excluded plaintiff from the Area of Institutional Controls. Pl.'s PFUF ¶ 31 (citing Evatz Decl. ¶ 11).

Between 1998 and 2000, EPA placed 200,000 yards of fill dirt on the Area of Institutional Controls and constructed the landfill cap, together with a drainage system and

perimeter road. PFUF ¶ 32. EPA has abandoned several of the previously installed monitoring wells on the leased Property and in the Area of Institutional Controls. *See* Compl. at 9; Pl.'s Suppl. Br. at 7. Plaintiff's complaint was filed May 20, 2002.

## II. Discussion

### A. Standard of Review

A motion for judgment on the pleadings is treated as a motion for summary judgment under Rule 56 if "matters outside the pleadings are presented to and not excluded by the court." Rules of the United States Court of Federal Claims (RCFC) 12(c). Both parties included materials outside of the pleadings in their briefing. Therefore the court addresses defendant's alternative motion for summary judgment.

Summary judgment is warranted when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact that might significantly affect the outcome of the litigation is material. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Disputes over facts that are not outcome determinative will not preclude the entry of summary judgment. *Id.* at 247–48, 106 S.Ct. 2505.

The party moving for summary judgment bears the initial burden of demonstrating the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party demonstrates an absence of a genuine issue of material fact, the burden then shifts to the non-moving party to show that a genuine issue exists. *Sweats Fashions, Inc. v. Pannill Knitting Co.,* 833 F.2d 1560, 1562–63 (Fed.Cir.1987). The movant is also entitled to summary judgment if the non-movant fails to make a showing sufficient to establish an element of its case on which it will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548. The court must resolve any doubts

---

8. The Area of Institutional Controls is located primarily in the northeastern portion of the Property. *See* Compl. Ex. 8.

about factual issues in favor of the party opposing summary judgment, *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163 (Fed.Cir.1985), to whom the benefits of all favorable inferences and presumptions run. *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed.Cir. 1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

### B. Statute of Limitations

Defendant argues that plaintiff's complaint should be dismissed as time-barred under the applicable statute of limitations because plaintiff's claim accrued, at the latest, in 1992, nearly ten years before the filing of plaintiff's complaint. *See* Def.'s Mot. at 1. Plaintiff maintains that defendant has incorrectly calculated the date of accrual for plaintiff's claims and that plaintiff's complaint was filed well within the statute of limitation period. *See* Pl.'s Opp. at 9.

The applicable statute of limitations for filing suit in the Court of Federal Claims is six years. 28 U.S.C. § 2501 (1994). The statute provides that "[e]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." *Id.* The six-year limitations period for actions against the United States "is a jurisdictional requirement attached by Congress" that must be strictly construed. *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1576–77 (Fed.Cir.1988); *see also Franconia Assocs. v. United States*, 240 F.3d 1358, 1362 (Fed.Cir. 2001)[9] (quoting *Hart v. United States*, 910 F.2d 815, 817 (Fed.Cir.1990)) ("The six-year statute of limitations acts as 'an express limitation on the Tucker Act's waiver of sovereign immunity.' "); *Seldovia Native Ass'n v. United States*, 144 F.3d 769, 774 (Fed.Cir. 1998) (stating that "statute of limitations issues ... are jurisdictional").

To defeat defendant's motion to dismiss this case, plaintiffs must establish "jurisdictional timeliness." *Alder Terrace, Inc. v. United States*, 161 F.3d 1372, 1377 (Fed.Cir. 1998) (citing *McNutt v. Gen. Motors Accep-*

*tance Corp. of Ind.*, 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936)). Plaintiff cannot rely merely on the allegations in the complaint if jurisdiction is challenged. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed.Cir.1988). Because plaintiff bears the burden of proof by a preponderance of the evidence, it must offer relevant, competent evidence to show that it filed suit within six years of the accrual of its claims. *See* 28 U.S.C. § 2501; *Reynolds*, 846 F.2d at 748; *Martinez v. United States*, 48 Fed.Cl. 851, 857 (2001).

### 1. Accrual of the Claim

Defendant contends that plaintiff's claim accrued no later than December 1992 because the critical events which gave rise to plaintiff's claim had all taken place by that time. *See* Def.'s Mot. at 1. Defendant argues that EPA's physical occupation of the Property, initial removal of hazardous materials, installation of several monitoring wells, and original fencing off of a large portion of the Property were " 'all the events ... which fix the alleged liability of the defendant.' " Def.'s Mot. at 10 (quoting *Hopland Band*, 855 F.2d at 1577).

Plaintiff responds that its physical takings claim did not accrue until its Property had been " 'clearly and permanently taken.' " Pl.'s Opp. at 15 (quoting *Hornback v. United States*, 52 Fed.Cl. 374, 377 (2002) (internal citations omitted)). Plaintiff argues that this permanent taking did not occur until, at the earliest, January 1997 when the Administrative Order became effective, *see* Compl. at 6, or otherwise in April 1998 when EPA contractors installed the fence around the Area of Institutional Controls. Pl.'s Opp. at 23. Only then, plaintiff contends, did defendant totally exclude plaintiff from a portion of the Property and permanently physically occupy it for public use. *Id.* Before that, plaintiff was permitted access to the Property and in fact used the Area of Institutional Controls for mining purposes as late as December 1996. Compl. at 7; Evatz Decl. ¶ 10.

---

**9.** This decision was reversed in part on other grounds by *Franconia Assocs. v. United States*, 536 U.S. 129, 122 S.Ct. 1993, 153 L.Ed.2d 132 (2002).

Determining whether plaintiff's takings claim is time-barred requires the court to ascertain when the plaintiff's cause of action first accrued. A plaintiff has a "legal right to maintain his or her action" when the plaintiff's cause of action first accrues. *Catawba Indian Tribe of S.C. v. United States*, 982 F.2d 1564, 1570 (Fed.Cir.1993) (quoting 1 Calvin W. Corman, Limitations on Actions § 6.1, at 370–71 (1991)). "It is generally stated that a claim 'first accrues' when all the events have occurred which fix the alleged liability of the defendant and entitle the plaintiff to institute an action." *Hopland Band*, 855 F.2d at 1577. For physical takings cases, "[t]he key date for accrual purposes is that date on which plaintiff's property 'has been clearly and permanently taken.'" *Hornback*, 52 Fed.Cl. at 377 (quoting *Boling v. United States*, 220 F.3d 1365, 1370 (Fed.Cir.2000)). "[D]uring the time when it is uncertain whether the gradual process will result in a permanent taking, the plaintiff need not sue, but once it is clear that the process has resulted in a permanent taking and the extent of the damage is reasonably foreseeable, the claim accrues and the statute of limitations begins to run." *Boling*, 220 F.3d at 1371. Thus, the court must determine when defendant had clearly and permanently physically taken plaintiff's property to identify the date of accrual.

The United States Supreme Court defined what constitutes a permanent physical taking or occupation in *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 432, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982): "Property rights in a physical thing have been described as the rights 'to possess, use, and dispose of it.'" *Id.* at 435, 102 S.Ct. 3164 (quoting *United States v. Gen. Motors Corp.*, 323 U.S. 373, 378, 65 S.Ct. 357, 89 L.Ed. 311 (1945)). "To the extent that the government permanently occupies physical property, it effectively destroys *each* of these rights." *Id.* The Court defined the destruction of each of these three core property interests: (1) possession: "the owner has no right to possess the occupied space himself, and also has no power to exclude the occupier from possession and use of the space," *id.*; (2) use: "the permanent physical occupation of property forever denies the owner [of] any

power to control the use of the property; he not only cannot exclude others, but can make no nonpossessory use of the property," *id.* at 436, 65 S.Ct. 357; and (3) disposal: "even though the owner may retain the bare legal right to dispose of the occupied space ..., the permanent occupation of that space ... will ordinarily empty the right of any value, since the purchaser will also be unable to make any use of the property." *Id.; see also Boise Cascade Corp.v. United States*, 296 F.3d 1339, 1353 (Fed.Cir.2002). The Court distinguished permanent physical occupations (to which the *Loretto* rule applies) from temporary physical invasions of property by government (to which the *Loretto* rule does not apply):

> The permanence and absolute exclusivity of a physical occupation distinguish it from temporary limitations on the right to exclude. Not every physical invasion is a taking ... [T]emporary limitations are subject to a more complex balancing process to determine whether they are a taking. The rationale is evident: they do not absolutely dispossess the owner of his rights to use, and exclude others from, his property.

*Id.* at 435 n. 12, 102 S.Ct. 3164.

This court has found that "a statute that regulates activities on land, such as CERCLA, may effect a *per se* taking where the regulation necessitates a permanent physical occupation of the subject property." *Scogin v. United States*, 33 Fed.Cl. 285, 290 (1995). However, "the execution of an administrative or court order, although purporting to allow physical occupation of private property, does not by itself constitute a taking of a compensable property right." *Id.* at 291 (citing *Tabb Lakes, Ltd. v. United States*, 10 F.3d 796, 801 (Fed.Cir.1993); *Hendler v. United States*, 952 F.2d 1364, 1375 (Fed.Cir.1991)). Instead, the focus must be on the actual character of the government action that allegedly physically interfered with the plaintiff's property rights. *See* Pl.'s Suppl. Br. at 12 (citing *Loretto*, 458 U.S. at 426, 102 S.Ct. 3164). If the government action, in addition to the order, has effectively extinguished the plaintiff's right to possess, use, and dispose of its property interest, then a permanent physical

taking has occurred. *Loretto,* 458 U.S. at 435, 102 S.Ct. 3164.

The United States Court of Appeals for the Federal Circuit held that the installation of monitoring wells by the EPA under the authority granted by CERCLA, as here, constituted a *per se* physical taking under *Loretto* of the area on which the wells were installed. *Hendler,* 952 F.2d at 1375; *see also McKay v. United States,* 199 F.3d 1376, 1381 (Fed.Cir.1999). The *Hendler* decision "rested squarely upon the permanent nature of the wells and the regular government intrusions to monitor them." *Boise Cascade,* 296 F.3d at 1355. The court noted that "[t]here is nothing 'temporary' about the wells the Government installed on plaintiff's property .... Years have passed since the Government installed the first wells. The wells are some 100 feet deep, lined with plastic and stainless steel, and surrounded by gravel and cement .... These surveillance wells are at least as 'permanent' in this sense as the CATV equipment in *Loretto* ...." *Hendler,* 952 F.2d at 1376. "[I]t is clear that the court ... meant to focus attention on the *character* of the government intrusion necessary to find a permanent occupation, rather than solely focusing on temporal duration." *Boise Cascade,* 296 F.3d at 1356. Indeed, the *Hendler* court found that "[i]n this context, 'permanent' does not mean forever, or anything like it. A taking can be for a limited term-what is 'taken' is, in the language of real property law, an estate for years, that is, a term of finite duration as distinct from the infinite term of an estate in fee simple absolute." *Hendler,* 952 F.2d at 1376. Thus, even if it did not permanently (in a temporal sense) occupy the property, the areas covered by the wells "involved total occupation" by the government, and therefore the only dispute concerned the amount of compensation to be paid to the displaced owner. *Boise Cascade,* 296 F.3d at 1357.

Drawing from the *Loretto* and *Hendler* analyses, the Federal Circuit has also addressed whether a permanent physical taking occurred despite the fact that the government allowed plaintiff access upon request to the allegedly taken premises. In *767 Third Avenue Associates v. United States,* 48 F.3d

1575 (Fed.Cir.1995), Sage Realty Corp. entered into leases with organizations from the Socialist Federal Republic of Yugoslavia ("SFRY"). *Id.* at 1576. Shortly after the leases were extended, war erupted in the SFRY and the United States formally acknowledged that the SFRY ceased to exist. *Id.* at 1577. Subsequently, President Bush issued an Executive Order which "blocked" the properties of SFRY organizations in the United States, including the properties leased from Sage. *Id.* (citing Exec. Order No. 12,808, 57 Fed.Reg. 23,299 (May 30, 1992)). Treasury agents inspected the premises and posted notices denying access for a short period of time. *Id.* at 1577–78. However, on the one occasion after these notices were posted in which Sage requested access to the premises, the government granted the request. *Id.* Sage filed suit in this court alleging a taking of its property, consisting of the benefits of its leases, for which it was entitled to just compensation under the Fifth Amendment. *Id.* This court held that the government "did not take physical possession of the subject premises and Sage was never physically denied access to the property on those occasions when it asked for access." *767 Third Ave. Assocs. v. United States,* 30 Fed. Cl. 216, 222 (1993), *aff'd,* 48 F.3d 1575 (Fed. Cir.1995). The posting of signs therefore did not constitute a separate physical taking. *See id.* The Federal Circuit affirmed, stating that "[a]lthough the notice was backed by the force of law, it did not physically prevent Sage from entering the premises, and access was available when requested." *767 Third Ave. Assocs.,* 48 F.3d at 1583–84. Thus, "the government's actions did not rise to the level of a *per se Loretto*-type physical taking." *Id.*

In *United States v. Charles George Trucking Co.,* 682 F.Supp. 1260 (D.Mass.1988), the United States District Court for the District of Massachusetts held that a CERCLA access order sought by EPA did not effect a taking of the defendant's property. *Id.* at 1271. The court found that while EPA's remedial actions to clean up the hazardous waste dump may "work a taking of the defendant's property by something akin to inverse condemnation," *id.* at 1271, "[i]f the government determines that it can perform the necessary remedial action without acqui-

sition of the subject property, it need not 'take' the property." *Id.* The court added that only when the *implementation* of the remedy worked an actual taking of the defendant's property would the defendant then have a justiciable claim for an inverse condemnation. *Id.*

■ In this case, defendant has not demonstrated that plaintiff's property was "clearly and permanently" taken in 1992 such that its physical takings accrued at that time. *See Boling*, 220 F.3d at 1370. As in *767 Third Avenue*, when plaintiff here protested the erection of the original fences around portions of the Property, defendant immediately allowed plaintiff access to the Property and removed the fences shortly thereafter. Evatz Decl. ¶ 6. Indeed, Edward W. Evatz, president of John R. Sand, included in his Declaration his "Yardage Book" which shows the dates and numbers of yards of stone and sand removed from the Property during the years 1991–1995. *See* Evatz Decl. ¶ 4; Evatz Decl. Ex. A. Furthermore, he stated that "John R. Sand was mining sand and gravel north of the storage pad (in the area that eventually became known as 'the Area of Institutional Controls') during 1996" and until the Administrative Order was issued denying him access. Evatz Decl. ¶ 10. Finally, as late as June 11, 1997, Evatz toured the Landfill Area (within the Area of Institutional Controls) with his attorney, who took photographs. Evatz Decl. ¶ 11; Evatz Decl. Ex. B–F.

Defendant has therefore failed to meet its burden of showing an absence of any genuine issues of material fact. In particular, defendant has failed to demonstrate that it "destroy[ed]" plaintiff's right to possess, use, or dispose of the Property or the Area of Institutional Controls upon construction of fences in the winter of 1992–1993. *See Loretto*, 458 U.S. at 434–35, 102 S.Ct. 3164. Instead, defendant merely alleges that "[p]laintiff was deprived *to some extent* of its 'right to possess, use, and dispose of' its property." Def.'s Reply at 8–9 (quoting *General Motors Corp.*,

323 U.S. at 378, 65 S.Ct. 357) (emphasis added). Being deprived "to some extent" of these rights is not sufficient to constitute a *Loretto*-type physical taking. Indeed, up until the Administrative Order of December 1996, plaintiff had the right to "possess the occupied space himself," *Loretto*, 458 U.S. at 435, 102 S.Ct. 3164, and plaintiff certainly made extensive and valuable "use" of the property by continuing its mining and gravel operations on portions of the Property and in the Area of Institutional Controls. *See* Evatz Decl. ¶ 10; Evatz Decl. Ex. A. Although defendant may have taken away plaintiff's right to exclude, it is "[t]he permanence and *absolute exclusivity* of a physical occupation" that distinguish physical takings from temporary limitations on the right to exclude. *Loretto*, 458 U.S. at 435 n. 12, 102 S.Ct. 3164 (emphasis added). "[S]uch temporary limitations are subject to a more complex balancing process to determine whether they are a taking." *Id.* Defendant does not suggest that the court undertake such a balancing test, but merely alleges a permanent physical taking (and thus an accrual date) beginning in the winter of 1992–93 or earlier. Def. Mot. at 10. Based on plaintiff's relevant, competent evidence of continued access to and operations on the Area of Institutional Controls until late 1996, *see Reynolds*, 846 F.2d at 748, defendant has failed to meet its burden of demonstrating an absence of genuine issues of material fact on this matter.

■ With regard to areas of the Property covered by permanently installed and not abandoned monitoring wells, however, defendant has met its burden. Like the wells in *Hendler*, "[t]here is nothing 'temporary'" about the permanent wells still in operation that were installed in or about 1989. *Hendler*, 952 F.2d at 1376. Indeed, plaintiff concedes that the monitoring wells identified as "10 series" and "MW–20" "permanently destroyed" some of its property rights under its lease. Pl.'s Supp. Br. at 24; *see also* Pl.'s Opp. Ex. 6 (map of Property showing location of wells).[10]

---

10. Plaintiff does argue, however, that the "17 series" of monitoring wells that were originally installed within the Landfill and subsequently removed or abandoned "cannot be seen to con-

stitute a permanent taking" because they no longer affect plaintiff's exercise of its property rights. Pl.'s Supp. Br. at 24. Thus, plaintiff contends, its takings claim for any space tempo-

Plaintiff correctly points out that "[t]he extent of the taking ... would be limited to the area taken, e.g., the location of the well or drum pit and possibly an attached access easement." *Id.* (citing *Hendler*, 952 F.2d at 1378). A taking of those individual well areas does not, however, automatically extend or "bootstrap" to become a permanent physical taking of the entire Area of Institutional Controls. *See* Pl.'s Suppl. Br. at 26. Indeed, "*Hendler's* holding was unremarkable and quite narrow: it merely held that when the government enters private land, sinks 100–foot deep steel reinforced wells surrounded by gravel and concrete, and thereafter proceeds to regularly enter the land to maintain and monitor the wells over a period of years, a per se taking under *Loretto* has occurred." *Boise Cascade*, 296 F.3d at 1357. This per se physical taking is to be limited "to the extent of the occupation," and no more. *Loretto*, 458 U.S. at 434–35, 102 S.Ct. 3164. Thus, because defendant's "well installation and excavation activities did not permanently destroy any right John R. Sand had in the sand and gravel located nearby," Pl.'s Suppl. Br. at 26, and because plaintiff was able to walk on the land and carry on its mining activities within the Area of Institutional Controls during the time after defendant claims a physical taking had accrued, *Id.* at 27; Evatz Decl. ¶ 10, defendant has failed to show an absence of any genuine issues of material fact except with regard to the permanent wells.

### 2. Knowledge of the Existence of the Claim

■ Defendant further argues that plaintiff's knowledge of the existence of a claim, as evidenced by its repeated letters threatening to exercise its legal rights, is proof that plaintiff was aware of "all the facts necessary to establish the liability of the United States for the alleged taking" in 1992–1994. Def.'s Mot. at 12 (quoting *Fallini v. United States*, 56 F.3d 1378, 1381 (Fed.Cir.1995)); *see also* Def.'s Reply at 9. Defendant relies on *Coastal Petroleum Co. v. United States*, 228 Ct.Cl. 864, 867, 1981 WL 21512 (1981), in which the Court of Claims stated that "[o]nce plaintiff is on inquiry that it has a potential claim, the statute of limitations begins to run." Def.'s Mot. at 11.

Plaintiff responds that the letters written by its counsel from 1992–1994 are merely evidence that access issues were being negotiated between the parties during that time and do not show that defendant permanently physically occupied plaintiff's property. Pl.'s PFUF ¶ 19. Despite these letters, plaintiff continued to access and use the Property up until the 1996 Administrative Order. Pl.'s Opp. at 23; Evatz Decl. ¶ 10. Thus, plaintiff contends, its property was not "clearly and permanently taken" until this time. *See* Pl.'s Opp. at 23; *Hornback*, 52 Fed.Cl. at 377.

The United States Supreme Court has held that "[t]he Fifth Amendment expresses a principle of fairness and not a technical rule of procedure enshrining old or new niceties regarding 'causes of action'—when they are born, whether they proliferate, and when they die." *United States v. Dickinson*, 331 U.S. 745, 748, 67 S.Ct. 1382, 91 L.Ed. 1789 (1947). In deciding when a plaintiff's cause of action for a physical takings claim began to

---

rarily occupied by these abandoned wells has not yet accrued. *See id.* at 30. However, "[a]ll takings are 'temporary,' in the sense that the government can always change its mind at a later time, and this is true whether the property interest taken is a possessory estate for years or a fee simple acquired through condemnation, or an easement of use by virtue of a regulation." *Hendler*, 952 F.2d at 1376. It appears to the court that, under *Hendler*, a taking by the installation of a well would ordinarily occur immediately upon the well's construction and resulting exclusion of a plaintiff. *See id.* Accordingly, six years after this stabilized and total destruction of a plaintiff's property rights, plaintiff's physical takings claim for that well area is time-barred. Thus, regardless of whether a well has been or

will be eventually abandoned or removed, if plaintiff's claim is brought more than six years after the well's construction, *Hendler* instructs that the well installation constituted a physical taking that has accrued and is time-barred. *See id.; see also Alliance of Descendants of Tex. v. United States*, 37 F.3d 1478, 1481 (Fed.Cir.1994) (holding that a claim under the Fifth Amendment accrues when the taking action occurs). That is not to say, however, that an area previously taken by a now-abandoned monitoring well could not be taken *again* by the construction of the Landfill Cap over the area in which the abandoned monitoring well once existed. *Cf. Creppel v. United States*, 41 F.3d 627 (Fed.Cir. 1994).

accrue, the Court found that even "[a]ssuming that such an action would be sustained, it is not a good enough reason why he must sue then or have, from that moment, the statute of limitations run against him .... And as there is nothing in reason, so there is nothing in legal doctrine, to preclude the law from meeting such a process by postponing suit until the situation becomes stabilized." *Id.* at 749, 67 S.Ct. 1382. The Court reasoned that, if a plaintiff were required to bring suit as soon as it realized it had a potential physical takings claim, "other contingencies would be running against him—for instance, the uncertainty of the damage and the risk of res judicata against recovering later for damage as yet uncertain." *Id.* Thus, "when the Government chooses not to condemn land but to bring about a taking by a continuing process of physical events, the owner is not required to resort either to piecemeal or premature litigation to ascertain the just compensation for what is really 'taken.'" *Id.*

The Federal Circuit has not interpreted *Dickinson* to require "that the damages from the alleged taking be complete and fully calculable before the cause of action accrues." *Fallini,* 56 F.3d at 1382. The Federal Circuit relied on *Delaware State College v. Ricks,* 449 U.S. 250, 258, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980), which found that the proper focus, for statute of limitations purposes, "is upon the time of the [defendant's] *acts,* not upon the time at which the *consequences* of the acts become the most painful." *Fallini,* 56 F.3d at 1383; *see also Nadler Foundry & Mach. Co. v. United States,* 143 Ct.Cl. 92, 164 F.Supp. 249, 251 (1958) (holding that *Dickinson* does not entitle the plaintiff to wait until damage is complete before filing suit). The Federal Circuit further clarified this matter in *Boling,* where the court explained that, properly understood, "stabilization" as discussed in *Dickinson* occurs when "the permanent nature of the taking is evident and the extent of the damage is reasonably foreseeable." 220 F.3d at 1371.

The *Dickinson* line of cases primarily involves takings occasioned by erosion that is traceable to flooding caused by the government. Because erosion caused by flooding is a gradual physical process, the plaintiff must wait to assert its claim until it knows whether the subjection to flooding is so substantial and frequent as to constitute a physical taking requiring just compensation. *See, e.g., Barnes v. United States,* 210 Ct.Cl. 467, 538 F.2d 865 (1976); *Applegate v. United States,* 25 F.3d 1579 (Fed.Cir.1994); *Boling,* 220 F.3d 1365; *see also Banks v. United States,* 314 F.3d 1304 (Fed.Cir.2003). Although this case is not factually on all fours with the erosion cases, their fundamental principles provide the court with guidance in determining whether plaintiff's claim accrued, as defendant asserts, in 1992 or earlier, simply because of plaintiff's knowledge of the existence of a potential claim at that time. *See* Def.'s Mot. at 12.

In making this assertion, defendant relies on several authorities. *See* Def.'s Mot. at 12 (quoting *Fallini,* 56 F.3d at 1380) ("Plaintiff's were 'cognizant of the facts underlying the alleged taking since long before they filed their complaint in the Court of Federal Claims,'" and thus their claim was time-barred.); Def.'s Mot. at 11 (quoting *Coastal Petroleum,* 228 Ct.Cl. at 867) ("'Once plaintiff is on inquiry that it has a *potential claim,* the statute of limitations begins to run.'"); Def.'s Reply at 9 (citing *Alaska v. United States,* 32 Fed.Cl. 689 (1995)).[11] Defendant's reliance on these cases is misplaced. In each case, the defendant's liability had already "stabilized" within the meaning of *Dickinson.* The "permanent nature" of the taking was evident and damages were reasonably foreseeable at the time the takings claim was found to accrue. *See Boling,* 220 F.3d at 1371.

In *Fallini,* ranchers contended that the government had taken their property by requiring them to provide water to wild horses whenever they gave water to their domestic livestock pursuant to the Wild Free–Roaming Horses and Burros Act. *Fallini,* 56 F.3d at 1380. However, the plaintiffs sued nine

---

11. In *Alaska v. United States,* the court stated that "[t]here is a critical difference between knowing of a potential claim and being certain that one will prevail on the merits at trial. The former, and not the latter, is sufficient to start the running of the statute of limitations." *Alaska,* 32 Fed.Cl. at 701.

years after the enactment of the Act, and "[n]othing that happened in those later years had the legal effect of triggering, for the first time, the Fallinis' obligation to sue for the alleged takings that had occurred since the enactment of the ... Act in 1971." *Fallini,* 56 F.3d at 1382. Thus, the plaintiff's claim was time-barred. *Id.*

Similarly, in *Coastal Petroleum,* the Court of Claims held that the plaintiff's claim began to accrue when a canal was constructed over land to which the plaintiff had leased the mineral rights, thereby preventing plaintiff's access to it and other limestone deposits in the surrounding lands. *Coastal Petroleum,* 228 Ct.Cl. at 868. The court found that "[t]he injury to one's mineral rights caused by construction of a Canal over the land in which these rights are leased is obviously knowable." *Id.* at 867. Thus, the plaintiff's claim accrued when the canal was completed and was time-barred when brought seven years later. *Id.* at 868.

Finally, in *Alaska v. United States,* this court held that the state of Alaska's takings claim based on the Export Administration Act of 1979, which prevented its export of crude oil transported over the Trans–Alaska Pipeline System (TAPS), was time-barred when brought in 1992. *Alaska,* 32 Fed.Cl. at 693–94. The court observed that "the export ban on TAPS oil has been completely stable since 1979. It has been in continuous effect and has not been substantively altered or modified . . . ." *Id.* at 700.

Unlike these cases, defendant's actions that allegedly took plaintiff's Property in this case were neither indisputably "stabilized" or of a "permanent nature" in 1992. Here, unlike *Fallini,* both parties' use of the Property changed subsequent to the erection of the original fences. *Cf. Fallini,* 56 F.3d at 1382. After being temporarily denied access to the Property, plaintiff demanded access and defendant granted it immediately. Evatz Decl. ¶ 6. Shortly thereafter the offending fences were moved. *Id.* Furthermore, unlike *Coastal Petroleum,* plaintiff here has not been shown to have been permanently denied any of its mineral rights, including access to sand or gravel in the Area of Institutional Controls, until the end of

1996. Evatz Decl. ¶ 10. Lastly, unlike *Alaska v. United States,* defendant's physical occupation of the Property and denial of plaintiff's access pursuant to the First ROD and the 1992–93 erection of fences was not "in continuous effect." *Cf. Alaska,* 32 Fed.Cl. at 700. Nor were defendant's activities without "substantive[ ] alter[ations] or modif[ications]" from time to time. *Cf. id.*

Instead, defendant's actions which amount to an alleged physical taking are more analogous to the "continuing process of physical events" addressed in *Dickinson. Dickinson,* 331 U.S. at 749, 67 S.Ct. 1382. EPA's activities on plaintiff's Property do not appear to the court to have been "stabilized" or "permanent in nature" for summary judgment purposes in 1992 or earlier. Fences were subsequently moved and removed. Evatz Decl. ¶ 6. The metes and bounds of the Landfill Cap were not yet defined. Pl.'s Suppl. Br. at 3. The Area of Institutional Controls had not been defined or implemented. *Id.* Profitable mining and gravel activities continued. Evatz Decl. ¶¶ 4, 10. Wells installed were later abandoned. Pl.'s Suppl. Br. at 7. Moreover, the Second ROD was subsequently amended in August of 1996 and was not implemented until the Administrative Order in December of 1996. Compl. at 5–6. Thus, although plaintiff appears to have known it had a potential takings claim, as shown by the letters written by its counsel in 1992–94, this is "not a good enough reason why he must sue then or have, from that moment, the statute of limitations run against him." *Dickinson,* 331 U.S. at 749, 67 S.Ct. 1382.

Plaintiff has provided sufficient evidence that it continued its gravel and mining operations throughout the 1990s and into 1996. *See* Evatz Decl. ¶ 10; Evatz Decl. Ex. A. Until December 1996, when EPA issued the Administrative Order which finally defined the metes and bounds of the Area of Institutional Controls and prohibited plaintiff's access by threat of a $25,000 a day penalty for noncompliance, *see* Compl. at 6–7, plaintiff continuously (excepting only temporary impediments) had access to much of the Property and was able to make valuable use of it, including use of the Area of Institutional Controls. Evatz Decl. ¶¶ 4, 8, 10. In these

circumstances, the court cannot find that it was "evident" to plaintiff that the nature of defendant's taking was permanent in 1992–1996. *See Boling,* 220 F.3d at 1371; *Fallini,* 56 F.3d at 1382.

Nor can the court find that plaintiff's right to possess, use, and dispose of the Property within the Area of Institutional Controls had been destroyed before May 20, 1996, the date six years before plaintiff's complaint was filed. *See Loretto,* 458 U.S. at 434–35, 102 S.Ct. 3164. Although the date of first accrual is a matter of law, *see Boling,* 220 F.3d at 1370–71, the court is mindful that takings jurisprudence is "uniquely fact intensive." *Ewald v. United States,* 14 Cl.Ct. 378, 382 (1988) (quoting *Juda v. United States,* 6 Cl. Ct. 441, 450 (1984)). Thus, " '[d]enial of a taking claim on the basis of the defense of limitations is warranted only when the facts alleged demonstrate conclusively that such a decision is required as a matter of law.' " *Id.* The facts before the court at this juncture, except with respect to the permanent monitoring wells, do not constitute such a conclusive demonstration. The court need not now decide exactly when plaintiff's claim first accrued. The court finds, however, that defendant has failed to meet its burden of demonstrating the absence of any genuine issues of material fact entitling it to judgment that plaintiff's claim is time-barred.

III.  Conclusion

For the foregoing reasons, defendant's motion for summary judgment that plaintiff's complaint is time-barred is DENIED, except with respect to the monitoring wells not abandoned and still in operation, as to which it is GRANTED. Accordingly, the court LIFTS its stay of briefing on Plaintiff's Motion and Brief for Partial Summary Judgment on Liability (Plaintiff's Motion). The parties shall resume briefing on Plaintiff's Motion in accordance with the Rules of the Court of Federal Claims as if Plaintiff's Motion had been filed on the date of this Opinion and Order.

IT IS SO ORDERED.