JOHN R. SAND & GRAVEL COMPANY, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 02–509 L.

United States Court of Federal Claims.

April 2, 2004.

Jeffrey K. Haynes, Bloomfield Hills, MI, with whom was L. Rider Brice, III, Bloomfield Hills, MI, for plaintiff.

John S. Most, with whom was Thomas L. Sansonetti, Assistant Attorney General, United States Department of Justice, Environment & Natural Resources Division, Washington, DC, for defendant. Susan V. Cook, United States Department of Justice, Washington, DC, and Peter Felitti, Associate Regional Counsel, United States Environmental Protection Agency, Washington, DC, of counsel.

## OPINION

HEWITT, Judge.

This case is before the court on Plaintiff's Motion and Brief for Partial Summary Judgment on Liability (Pl.'s Mot.) and defendant's Cross–Motion for Summary Judgment, Opposition to Plaintiff's Motion for Partial Summary Judgment, and Memorandum in Support (Def.'s Cross–Mot.). Plaintiff John R. Sand & Gravel Company seeks compensation

for defendant's physical taking of plaintiff's property during the environmental remediation of the Metamora Landfill in Lapeer County, Michigan. First Supplemental Complaint (Supp.Compl.) ¶¶ 1, 2, 51–71.

The motions address two principal issues: first, whether the Supreme Court's articulation in *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), of the nuisance exception to takings liability applies to physical takings and, second, if the *Lucas* nuisance exception is available as a defense in a physical takings case, whether it applies to the facts in this case. For the following reasons, the court GRANTS defendant's cross-motion for summary judgment that the *Lucas* nuisance exception can be available as a defense in a physical takings case. The balance of defendant's cross-motion and plaintiff's motion are DENIED.

I. Background[1]

In 1969, plaintiff John R. Sand & Gravel Company leased from Russell and Mildred Parrish a 158–acre tract of land in Metamora Township, Lapeer County, Michigan for a term of fifty years. Plaintiff's Responses to Defendant's Proposed Findings of Uncontroverted Fact (Pl.'s PFUF Resp.) ¶ 1; Supp. Compl. Ex. 1 (lease). The Parrishes owned the property in fee simple absolute, *see* Supp. Compl. Ex. 1 ¶ 5 ("The parties of the first part covenant and warrant that they are the owners of the above described premises in fee simple and absolute ...."), and leased plaintiff the land

for the purpose of stripping the land, taking out and removing therefrom the marketable stone and sand, which is, or which may hereafter be found on, in or under

said land, together with the right to construct or build, and to make all excavations, pits openings, ditches, roadways and other improvements upon the said premises, which are or may become necessary or suitable for removing sand and stone from the said premises,

*id.* Ex. 1 ¶ 1. The lease contains a covenant of quiet enjoyment. *See id.* Ex. 1 ¶ 5 ("The parties of the first part ... warrant and covenant that the second part shall have quiet and peaceful possession [of the leased property]."). The lease also provides that John R. Sand & Gravel Co. "agrees to operate its mining operations according to the Zoning Ordinance for the Township of Metamora and according to all conditions as required in a Gravel and Sand Mining Permit as issued by the Township of Metamora, Lapeer County, Michigan." *Id.* Ex. 1 ¶ 7.

A landfill (the Metamora Landfill site) is located on the northern portion of the 158–acre tract. Pl.'s PFUF Resp. ¶ 2. The landfill operated from 1955 until 1980.[2] *United States v. BASF–INMONT Corp.*, 819 F.Supp. 601, 604 (E.D.Mich.1993). In 1981, the Michigan Department of Natural Resources began investigations of the site following the discovery of drums containing hazardous waste. Def.'s Cross–Mot. Ex. 5 (Environmental Protection Agency, Record of Decision (1986)). In 1984, the Environmental Protection Agency (EPA) placed the Metamora Landfill site on its "National Priorities List" of hazardous waste sites, pursuant to the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 U.S.C. §§ 9601–9675 (2000). Pl.'s PFUF Resp. ¶ 2. After investigating the landfill site and formulating remedial action plans, the EPA and its agents began remov-

---

1. Facts cited to the filing of only one party do not appear to be in dispute. For additional background information, see *John R. Sand & Gravel Co. v. United States*, 59 Fed.Cl. 645, 647–48 (2004) (denying motion to intervene by group of entities who participated in the remediation of the Metamora Landfill site), *appeal docketed,* No. 04–5066 (Fed.Cir. Feb. 27, 2004); *John R. Sand & Gravel Co. v. United States*, 57 Fed.Cl. 182, 193 (2003) (denying "defendant's motion for summary judgment that plaintiff's complaint is time-barred ..., except with respect to the monitoring wells not abandoned and still in operation").

2. The Environmental Protection Agency's 1986 Record of Decision indicates that the landfill opened in 1966. *See* Def.'s Cross–Mot. Ex. 5 ("The landfill began operations in 1966 as a privately owned, unregulated open dump."). However, a subsequent Record of Decision issued in 1990 states that the landfill began operations in 1955. *See id.* Ex. 8. Whether the landfill began operating in 1955 or 1966, it was in operation before plaintiff began leasing the land in 1969.

ing contaminated material from the site in 1992. *Id.* ¶¶ 3–4.

In 1993, the District Court for the Eastern District of Michigan approved a Consent Decree which required a group of potentially responsible parties ("Settling Defendants") to undertake and to pay for certain remedial measures to clean up the Metamora Landfill site. *BASF–INMONT Corp.,* 819 F.Supp. at 604–05. Plaintiff was not a party to the Consent Decree, Supp. Compl. ¶ 25; *see also BASF–INMONT Corp.,* 819 F.Supp. at 601 (listing the parties to the Consent Decree in the case caption), and was not named as a potentially responsible party in connection with the contamination, *see* Defendant's Responses to Plaintiff's Proposed Findings of Uncontroverted Fact Dated May 13, 2003 ¶ 34 (agreeing with plaintiff that plaintiff "has never been named a potentially responsible party in relation to liability for contamination at the Metamora Landfill").

On August 28, 1996, the EPA amended the final remedial action plan to provide that contaminated soil excavated from a portion of the landfill be consolidated with other waste material from the landfill and redeposited on the landfill under a landfill cap. Defendant's Responses to Plaintiff's Proposed Findings of Uncontroverted Fact (Def.'s PFUF Resp.) ¶ 20; Plaintiff's Response to Defendant's Cross–Motion for Summary Judgment, and Plaintiff's Reply to Defendant's Response in Opposition to Plaintiff's Motion for Partial Summary Judgment on Liability (Pl.'s Resp.) Ex. 12, at 8. On December 18, 1996, the EPA issued an Administrative Order to plaintiff requiring plaintiff to grant the EPA and its agents, contractors, subcontractors, consultants and representatives entry and access to all portions of the leased property for all activities necessary to complete actions required under the Consent Decree. Supp. Compl. Ex. 2 ¶ 6(a) (Administrative Order Directing Compliance with Request for Access in *In re Metamora Landfill Site,* No. 97–C–379 (EPA Dec. 18, 1996)). The Administrative Order prohibits plaintiff from interfering with the area containing the landfill

cap (the Area of Institutional Controls) [3] by excavating, grading, filling, drilling, mining, storage, disposal or other construction or development. *Id.* Ex. 2 ¶ 6(g). Plaintiff, under threat of a $25,000 a day penalty for noncompliance, *id.* Ex. 2 ¶ 13, complied with the Administrative Order and ceased all mining activity in the Area of Institutional Controls, Pl.'s Mot. Ex. 1 ¶¶ 7–9 (Second Declaration of Edward W. Evatz, Jr.). At the time that the EPA issued the Administrative Order, plaintiff was mining within the Area of Institutional Controls. Def.'s PFUF Resp. ¶ 23.

Plaintiff filed a takings claim in this court on May 21, 2002, Complaint at 1, alleging that the EPA and its agents physically took portions of plaintiff's leased property in order to implement the remedy at the Metamora Landfill site, Supp. Compl. ¶¶ 52, 60, 67. In a prior opinion, the court ruled that most of plaintiff's takings claims are not barred by the statute of limitations. *See John R. Sand & Gravel Co. v. United States,* 57 Fed.Cl. 182, 193 (2003) ("Nor can the court find that plaintiff's right to possess, use, and dispose of the Property within the Area of Institutional Controls had been destroyed before May 20, 1996, the date six years before plaintiff's complaint was filed."). The case is now before the court on the parties' cross-motions for summary judgment on liability.

II. Discussion

A. Standard of Review

Summary judgment is warranted when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Rules of the United States Court of Federal Claims (RCFC) 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact that might significantly affect the outcome of the litigation is material. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Disputes over facts that are not outcome determinative will not preclude the entry of summary judgment. *Id.* at 247–48, 106 S.Ct. 2505.

---

**3.** The Area of Institutional Controls is located primarily in the northeastern portion of the

Property. *See* Supp. Compl. Ex. 8(map).

The party moving for summary judgment bears the initial burden of demonstrating the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party demonstrates an absence of a genuine issue of material fact, the burden then shifts to the non-moving party to show that a genuine issue exists. *Sweats Fashions, Inc. v. Pannill Knitting Co.,* 833 F.2d 1560, 1562–63 (Fed.Cir.1987). The movant is also entitled to summary judgment if the non-movant fails to make a showing sufficient to establish an element of its case on which it will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548. The court must resolve any doubts about factual issues in favor of the party opposing summary judgment, *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.,* 755 F.2d 158, 163 (Fed.Cir.1985), to whom the benefits of all favorable inferences and presumptions run, *H.F. Allen Orchards v. United States,* 749 F.2d 1571, 1574 (Fed.Cir.1984). "When both parties move for summary judgment, each party's motion must be evaluated on its own merits and all reasonable inferences must be resolved against the party whose motion is under consideration." *McKay v. United States,* 199 F.3d 1376, 1380 (Fed.Cir.1999).

B. Takings Jurisprudence and the Application of *Lucas* to Physical Takings Cases

■ The Fifth Amendment to the United States Constitution provides, in part, "nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V. The case law addresses two general categories of takings cases-physical and regulatory. A physical taking occurs "when the government encroaches upon or occupies private land for its own proposed use." *Palazzolo v. Rhode Island,* 533 U.S. 606, 617, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001). A regulatory taking occurs "when government action, although not encroaching upon or occupying private property, still affects and limits its use to such an extent that a taking occurs." *Cienega Gardens v. United States,* 265 F.3d 1237, 1244 (Fed.Cir.2001) (citing *Palazzolo,* 533 U.S. at 617, 121 S.Ct. 2448).

The regulatory takings category is further subdivided into categorical and non-categorical takings. A categorical taking is "one in which *all* economically viable use, i.e., all economic value, has been taken by the regulatory imposition." *Palm Beach Isles Assocs. v. United States,* 231 F.3d 1354, 1357 (Fed.Cir.2000). A non-categorical taking is one "that is the consequence of a regulatory imposition that prohibits or restricts only some of the uses that would otherwise be available to the property owner, but leaves the owner with substantial viable economic use." *Id.*

The first step in analyzing both physical and regulatory takings claims is to determine whether a claimant has a property interest. *See, e.g., M & J Coal Co. v. United States,* 47 F.3d 1148, 1154 (Fed.Cir.1995) (stating, in a regulatory takings case, that a court should "[f]irst ... inquire into the nature of the land owner's estate to determine whether the use interest proscribed by the governmental action was part of the owner's title to begin with"); *Skip Kirchdorfer, Inc. v. United States,* 6 F.3d 1573, 1580 (Fed.Cir.1993) (stating, in a physical takings case, that "[a] taking compensable under the Fifth Amendment inherently requires the existence of 'private property.'"). The second step in a takings analysis is to determine whether a taking occurred. *See, e.g., M & J Coal,* 47 F.3d at 1154 (stating that if a claimant can establish an interest in property, "the court must then determine whether the governmental action at issue constituted a compensable taking of that 'stick'"); *Skip Kirchdorfer,* 6 F.3d at 1582 ("To recover under the Takings Clause, a claimant with a recognized property interest must show that its interest was 'taken.'").

■ In making the first determination, a plaintiff bears the burden of demonstrating that a property interest exists. *See, e.g., M & J Coal,* 47 F.3d at 1154 (stating that the court only proceeds to the second step in a takings analysis "if the claimant can establish the existence of [a property] interest"); *Skip Kirchdorfer,* 6 F.3d at 1580 ("[T]he plaintiff must show a legally-cognizable property interest."). Courts look to state law "to define the range of interests that qualify for protec-

tion as 'property' under the Fifth and Fourteenth Amendments." *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1030, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). If background principles of a state's nuisance and property law bar a property owner from using land in a certain way, then the Takings Clause does not require compensation for an alleged taking to abate that use. *Id.* at 1031–32, 112 S.Ct. 2886. To resist compensation under this theory, "[defendant] must identify background principles of nuisance and property law that prohibit the uses [the plaintiff] now intends in the circumstances in which the property is presently found." *Id.* at 1031, 112 S.Ct. 2886. If a defendant can show such an inherent limitation in the plaintiff's title, then nothing is taken. *Id.* at 1031–32, 112 S.Ct. 2886. Because *Lucas* was a regulatory takings case, *see id.* at 1009, 112 S.Ct. 2886 (stating that plaintiff alleged a taking based on the state's passage of the Beachfront Management Act), plaintiff and defendant dispute whether the "background principles" exception to takings liability applies to physical takings as well as to regulatory takings.

■ Defendant argues that " 'the nuisance exception applies equally to physical taking and regulatory taking analysis.' " Defendant's Reply Brief in Support of Cross–Motion for Summary Judgment (Def.'s Reply) at 6 (quoting *Hendler v. United States,* 36 Fed. Cl. 574, 586 (1996), *supplemental opinion,* 38 Fed.Cl. 611 (1997), *aff'd,* 175 F.3d 1374 (Fed. Cir.1999)). Defendant states that this is because

> regardless of whether a physical or regulatory taking is involved, the threshold inquiry concerning the nature of the property interest must be addressed. This requires a consideration of the "restrictions that background principles of the State's law of property and nuisance already place upon land ownership." If inherent limitations on an owner's title exist at all, they exist no matter what type of taking is involved.

*Id.* at 7 (quoting *Lucas,* 505 U.S. at 1028–29, 112 S.Ct. 2886). Plaintiff responds that "[d]efendant bases its analysis on dicta from *Lucas* and *Hendler,*" and that "[t]he *Lucas* nuisance exception does not apply to physical

takings." Pl.'s Resp. at 6. With regard to *Lucas,* plaintiff states that, although the Supreme Court "analyz[ed] exceptions applicable to physical and regulatory takings, the Court stated clearly that the nuisance exception was limited to 'regulations' restricting a use that could otherwise have been restricted by state nuisance law." *Id.* In distinguishing *Hendler,* plaintiff states that *Hendler* involved only a regulatory taking claim. *Id.* at 7.

The court finds that the better-reasoned position is that the background principles exception to takings liability discussed in *Lucas* can apply to both regulatory and physical takings cases. The court's position is supported both by a close reading of the *Lucas* decision and by takings case law discussing the *Lucas* decision.

The *Lucas* opinion begins its discussion of the owner's property interest with the following sentences:

> Where the State seeks to sustain regulation that deprives land of all economically beneficial use, we think it may resist compensation only if the logically antecedent inquiry into the nature of the owner's estate shows that the proscribed use interests were not part of his title to begin with. This accords, we think, with our "takings" jurisprudence, which has traditionally been guided by the understandings of our citizens regarding the content of, and the State's power over, the "bundle of rights" that they acquire when they obtain title to property.

505 U.S. at 1027, 112 S.Ct. 2886. Plaintiff is correct that, on its face, the first sentence only refers to "regulation[s]." Pl.'s Resp. at 6. However, the "inquir[y] into the nature of the land owner's estate," *M & J Coal,* 47 F.3d at 1154, is the first step in both regulatory and physical takings analysis. *See, e.g., Boise Cascade Corp. v. United States,* 296 F.3d 1339, 1343, 1345, 1352 (Fed.Cir.2002) (setting out the "two-step approach to takings claims" in the introduction to section II, before analyzing the regulatory takings claim in II.B and the physical takings claim in II.C); *Kim v. City of New York,* 90 N.Y.2d 1, 659 N.Y.S.2d 145, 681 N.E.2d 312, 314 (1997) ("A threshold inquiry into an owner's title is

generally necessary to the proper analysis of a takings case, whether of a regulatory or physical nature."). The second sentence affirms the Court's view (a view stated without any apparent limitation to regulatory takings) that takings law "traditionally" recognizes the state's power over property, including the power to define what property is. *See Lucas,* 505 U.S. at 1030, 112 S.Ct. 2886 (stating that state law "define[s] the range of interests that qualify for protection as 'property' "). "Traditional" takings law is, of course, the law of physical takings. *See Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency,* 535 U.S. 302, 321, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002) ("Our jurisprudence involving condemnations and physical takings is as old as the Republic . . . . Our regulatory takings jurisprudence, in contrast, is of more recent vintage . . . .").

 The very next paragraph in *Lucas* begins with a sentence addressing physical takings:

> Where "permanent physical occupation" of land is concerned, we have refused to allow the government to decree it anew (without compensation), no matter how weighty the asserted "public interests" involved-though we assuredly *would* permit the government to assert a permanent easement that was a pre-existing limitation upon the landowner's title.

*Lucas,* 505 U.S. at 1028–29, 112 S.Ct. 2886 (citation omitted). Both parties invoke this sentence to support their arguments. *See* Def.'s Reply at 4; Pl.'s Resp. at 2. The core of plaintiff's argument is that the creation of the Area of Institutional Controls is a " 'permanent physical occupation' " for which defendant has a categorical duty to compensate plaintiff under the Takings Clause. *See* Pl.'s Resp. at 2, 5–6. The court, however, agrees with defendant that the first part of the sentence should be interpreted to be the general rule to which the latter part is the exception. The general rule is that, in physical takings cases, the government owes compensation to a property owner regardless of the public interest served by taking the property. This is a restatement of the Supreme Court's holding in *Loretto v. Teleprompter Manhattan CATV Corp.* that "a permanent

physical occupation authorized by government is a taking without regard to the public interests that it may serve." 458 U.S. 419, 426, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982). The exception to this general rule is that the government does not owe compensation where the property owner's use of his property is subject to a "pre-existing limitation" on title. Thus, a physical takings claim can be defeated where the owner intends a use that is prohibited as a nuisance by the owner's title and where the state has the authority to abate the nuisance use.

Far from limiting the general rule and exception to regulatory takings cases, the *Lucas* decision in fact takes the general rule and exception from physical takings cases and applies the general rule and exception to confiscatory regulatory takings cases:

> We believe similar treatment must be accorded confiscatory regulations, *i.e.,* regulations that prohibit all economically beneficial use of land: Any limitation so severe cannot be newly legislated or decreed (without compensation), but must inhere in the title itself, in the restrictions that background principles of the State's law of property and nuisance already place upon land ownership. A law or decree with such an effect must, in other words, do no more than duplicate the result that could have been achieved in the courts-by adjacent landowners (or other uniquely affected persons) under the State's law of private nuisance, or by the State under its complementary power to abate nuisances that affect the public generally, or otherwise.

505 U.S. at 1029, 112 S.Ct. 2886. The Court can apply the general rule and exception from physical takings to regulatory takings because the starting point for both analyses is an examination of the nature of the property interest or title the owner possesses.

Property has been described as a "bundle of sticks," *see, e.g., United States v. Craft,* 535 U.S. 274, 278, 122 S.Ct. 1414, 152 L.Ed.2d 437 (2002), and as the "group of rights inhering in the citizen's relation to the physical thing, as the right to possess, use and dispose of it," *United States v. General Motors Corp.,* 323 U.S. 373, 378, 65 S.Ct. 357,

89 L.Ed. 311 (1945); *see also Black's Law Dictionary* 1232 (7th ed.1999) (defining property as "[t]he right to possess, use, and enjoy a determinate thing"). William Blackstone stated that the right of property "consists in the free use, enjoyment, and disposal of all a person's acquisitions." *Black's Law Dictionary* 955 (2d ed.1910) (citing 1 William Blackstone, *Commentaries* \*138; 2 William Blackstone, *Commentaries* \*2, \*15). However, it has always been recognized that an owner's power over his property is not absolute, that is, there are some limits as to how a property owner can use his property. Blackstone qualified his definition of property by stating that a property owner possesses property rights "without any control or diminution *save only by the laws of the land.*" *Black's Law Dictionary* 955 (2d ed.1910) (citing 1 William Blackstone, *Commentaries* \*138; 2 William Blackstone, *Commentaries* \*2, \*15) (emphasis added). Thus, "[p]roperty rights as a matter of law since Blackstone's day have been understood to be subject to the power of the state to abate nuisances." *Loveladies Harbor, Inc. v. United States,* 28 F.3d 1171, 1179 (Fed.Cir.1994). The Supreme Court recognized this principle when it stated that "[l]ong ago it was recognized that 'all property in this country is held under the implied obligation that the owner's use of it shall not be injurious to the community.'" *Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 491–92, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987) (quoting *Mugler v. Kansas,* 123 U.S. 623, 665, 8 S.Ct. 273, 31 L.Ed. 205 (1887)).

The Supreme Court in *Lucas* recognized these foundational principles of property law. Because "[s]tate law determines only which sticks are in a person's bundle" of property rights, *Craft,* 535 U.S. at 278, 122 S.Ct. 1414, background principles of state nuisance and property law "inhere in the title itself," *Lucas,* 505 U.S. at 1029, 112 S.Ct. 2886. *Cf. Loveladies Harbor,* 28 F.3d at 1179 (stating that property rights do not include the power to create a nuisance). Those principles inhere in *all* property titles, *see Preseault v. United States,* 100 F.3d 1525, 1539 (Fed.Cir. 1996) (stating that common law nuisance principles "inhere in *every* property owner's title" (emphasis added)); *Abrahim–Youri v.*

*United States,* 139 F.3d 1462, 1468 (Fed.Cir. 1997) (stating that a state's power to control nuisances is "a power that inhere[s] in *all* land titles" (emphasis added)), and describe the bounds of how a property owner can use his property. Thus, the inquiry into the nature of the property interest a claimant possesses, which is the first step in all takings analyses, requires consideration of background principles of state property and nuisance law that inhere in title and restrict the uses to which an owner can put his property. *See Lucas,* 505 U.S. at 1027, 112 S.Ct. 2886 (stating that the first part of the takings inquiry is whether "the proscribed use interests were ... part of [the owner's] title to begin with"). Once the nature of the property interest has been determined, the characterization-as "physical" or "regulatory"-of any action by the government that is alleged to be a taking does not reduce or enlarge the nature of the property interest. The court concludes that a background principle of state nuisance or property law that inheres in and restricts what an owner can do with his property does so regardless of the type of taking an owner alleges.

The foregoing analysis limits plaintiff's argument that "precedents from regulatory takings are not applicable to physical takings and vice versa." Pl.'s Resp. at 7. Plaintiff cites, *id.* at 7–8, the following statement by the Supreme Court in support of its argument:

> [The] longstanding distinction between acquisitions of property for public use, on the one hand, and regulations prohibiting private uses, on the other, makes it inappropriate to treat cases involving physical takings as controlling precedents for the evaluation of a claim that there has been a 'regulatory taking,' and vice versa. For the same reason that we do not ask whether a physical appropriation advances a substantial government interest or whether it deprives the owner of all economically valuable use, we do not apply our precedent from the physical takings context to regulatory takings claims.

*Tahoe–Sierra Pres. Council,* 535 U.S. at 323–24, 122 S.Ct. 1465 (footnote omitted). However, this passage from *Tahoe–Sierra* focuses

on the second step of the takings analysis: whether a taking occurred, rather than on the first: whether the property owner possesses the interest allegedly taken. Because the nature of the property interest does not change according to whether the government physically or through regulations "takes" property, the court considers precedents from both regulatory and physical takings cases when determining the nature of the property interest.

The court's view that the background principles exception applies to physical takings cases also finds support in case law. *See, e.g., Chevy Chase Land Co. v. United States*, 37 Fed.Cl. 545, 582 (1997) ("Once a party has shown either a full confiscation of use of property or a permanent physical occupation, before a court may determine that a taking has occurred per se, an antecedent inquiry must be conducted into the existence of any possible 'pre-existing limitations' upon the property involved."); *id.* (applying the pre-existing limitation analysis to a physical takings case and stating that the *Lucas* Court's "investigation into [the] analytical framework for *per se* regulatory taking also discussed the framework to be utilized for *per se* physical takings"); *Hendler*, 36 Fed.Cl. at 586 n. 13 ("[T]he nuisance exception applied in this case would obviate the need for compensation even under the physical taking theory."). The Federal Circuit, in *Palm Beach Isles*, used the *Lucas* court's recognition that categorical regulatory takings and physical takings are equivalent, *see Lucas*, 505 U.S. at 1028–29, 112 S.Ct. 2886 ("Where 'permanent physical occupation' of land is concerned, we have refused to allow the government to decree it anew (without compensation) .... We believe similar treatment must be accorded confiscatory regulations, i.e., regulations that prohibit all economically beneficial use of land ...."), to reach its holding. In *Palm Beach Isles*, the Federal Circuit recognized the "rule" from *Lucas* that "a total deprivation of beneficial use by regulatory imposition [i]s akin to a physical taking." 231 F.3d at 1362. The Federal Circuit noted that "[h]ad the [*Lucas*] court intended to make analysis of a categorical regulatory taking different from the categorical physical taking ... surely somewhere in the opinion there

would be a hint of it. There is not." *Id.* The Federal Circuit observed that the *Lucas* court "repeated[ly] juxtapos[es] ... physical takings with 'categorical' regulatory takings" and makes "repeated unqualified statements that the latter deserve the same compensation without more." *Id.* The Federal Circuit used the Supreme Court's treatment of physical takings and categorical regulatory takings as equivalent to justify its holding that

> when a regulatory taking, properly determined to be "categorical," is found to have occurred, the property owner is entitled to a recovery without regard to consideration of investment-backed expectations. In such a case, "reasonable investment-backed expectations" are not a proper part of the analysis, just as they are not in physical takings cases.... The right to recovery is of course subject to the government's defenses under the general rubric of nuisance enunciated in *Lucas* ....

*Id.* at 1364. The Federal Circuit's statement that the analysis of whether a taking occurred is the same for categorical regulatory takings and physical takings, followed by a sentence recognizing the *Lucas* background principles exception, supports the view that the nuisance exception is applicable to both categorical regulatory takings and physical takings.

In *McKay v. United States*, 199 F.3d 1376 (Fed.Cir.1999), the Federal Circuit directs the court to look to state law to define the property interest in physical takings cases. The plaintiffs in *McKay* granted surface rights to the defendant and retained the mineral interests. *Id.* at 1378. Later, the defendant installed groundwater monitoring wells that extended into the plaintiffs' mineral estate without the plaintiffs' consent. *Id.* When the plaintiffs brought a takings claim, the trial court held that the installation of groundwater monitoring wells did not constitute a physical taking because, under Colorado law, "the wells did not interfere with the use, possession, enjoyment or disposition of the [plaintiffs'] mineral interests." *Id.* at 1380. "[T]he trial court reasoned that Colorado state law allowed such interference into a mineral estate by a surface owner." *Id.* at 1381. Although the Federal Circuit agreed

that it was appropriate to look to state law "to determine if ... there was a property right that could be violated," *id.*, it disagreed with the trial court's interpretation of Colorado law, *id.* at 1382. The Federal Circuit did not "read the Colorado cases to require a mineral estate owner to submit to the drilling of multiple wells reaching into the underlying mineral interests for a period of years." *Id.* The Federal Circuit stated that the trial court's application of Colorado law conflicted with *Loretto* and *Lucas*, "which require[ ] compensation despite the minuteness of the physical invasion." *Id.* The court then reversed the trial court's grant of summary judgment for the defendant of no liability. *Id.* It appears to this court that, if the Federal Circuit had agreed with the trial court's interpretation of Colorado law, that is, that the defendant legally could interfere with the plaintiffs' property interest under the Colorado law, the Federal Circuit would have upheld the trial court's ruling that there was no taking, "despite the minuteness of the physical invasion," *id.*, because the plaintiff would have had no protected property interest under state law and, thus, no rights would have been invaded.[4]

▪ The court holds that the *Lucas* articulation of the background principles exception can apply to physical takings. In both physical and regulatory takings cases, just compensation will not be due if the exercise of a "property right" asserted by the owner was prohibited by state property law and could have been abated by a private party under the state's private nuisance law or by the government under its · power to abate public nuisances. When the government "takes" property, it can only take what the owner possesses. If the state property law can effect the abatement that is the basis for his takings claim, then the property owner cannot recover because nothing in his "bundle of rights that are commonly characterized as property," *Kaiser Aetna v. United States*, 444 U.S. 164, 176, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979), has been taken.

### C. Property Interest and Background Principles of Michigan Property and Nuisance Law

Under the foregoing interpretation of *Lucas*, whether a plaintiff alleges a physical or a regulatory taking, if background principles of a state's nuisance and property law prohibit the uses a plaintiff intends, then no taking has occurred. The defendant in a takings case must identify the background principles. *Lucas*, 505 U.S. at 1031, 112 S.Ct. 2886. A defendant is required to "do more than proffer the legislature's declaration that the uses [the plaintiff] desires are inconsistent with the public interest, or the conclusory assertion that they violate a common-law maxim such as *sic utere tuo ut alienum non laedas.*"[5] *Id.* Justice Scalia, in a dissent from a

---

4. An opinion of the United States Bankruptcy Court for the District of Connecticut, *In re Bernier*, 176 B.R. 976 (Bankr.D.Conn.1995), provides persuasive authority for the view that state law limitations on title apply as a defense to any takings claim. In that case, the defendant argued that section 363(h) of the Bankruptcy Code, 11 U.S.C. § 363(h) (2000), is unconstitutional under the Takings Clause because it allowed the bankruptcy trustee to sell the defendant's and the debtor's (defendant's husband) undivided one-half interests in their residence. *In re Bernier*, 176 B.R. at 979. The court stated that the answer to the question of whether the Takings Clause prohibited the application of section 363(h) "depend[ed] upon what property rights the defendant ha[d] in the residence under applicable Connecticut law. Put another way, the defendant's attempt to prevent the trustee from selling her interest in the residence depends upon whether that interest is protected by Connecticut law." *Id.* at 982. The court concluded that "the right of partition, including, in appropriate circumstances, partition by sale, inheres in

the very title to real property in Connecticut." *Id.* at 984. After concluding that section 363(h) was constitutional, the court held that section 363(h) did not violate the Takings Clause because defendant's property rights under Connecticut law "do not include the right to prevent her husband's creditors from selling the entire residence." *Id.* at 989. While the court did not find it necessary to categorize the type of taking, it noted that "the categorical takings analysis could apply" because defendant's property would be physically occupied if a sale were to occur. *Id.* The court stated that "[t]he real issue is whether the defendant's property rights have been appropriated, and under Connecticut law,... they have not." *Id.* The court found that, because there was a limitation on defendant's property interest under state law, there could be no taking of any type. *Id.* at 990.

5. The maxim may be translated as, "So use your own as not to injure another's property." *Black's Law Dictionary* 1690 (7th ed.1999).

denial of a petition for certiorari, warns that "nonexistent rules of state substantive law" cannot be invoked to deny rights protected by the federal Constitution. *Stevens v. City of Cannon Beach,* 510 U.S. 1207, 1211, 114 S.Ct. 1332, 127 L.Ed.2d 679 (1994). Justice Scalia states further that the *Lucas* opinion "would be a nullity if anything that a state court chooses to denominate 'background law'-regardless of whether it is really such-could eliminate property rights." *Id.* Not all background principles of state law are robust enough to fit within the *Lucas* background principles exception.[6]

The court views the task of determining whether background principles of Michigan law inhere in plaintiff's title and limit the uses to which plaintiff can put its property as a multi-step process. First, plaintiff must demonstrate that it possesses a property interest. Second, defendant must identify background principles of Michigan property or nuisance law that would prohibit the use of the land plaintiff intends. This step involves determining the relevant contours of Michigan property and nuisance law. Third, defendant must connect the state law to the facts of this case to show, for example, that the exercise of plaintiff's claimed property rights would be a nuisance and that actions by the government of which plaintiff complains are actions that could be taken under

Michigan law to abate the nuisance. Only on this showing can defendant succeed on its defense that it owes no compensation for physically occupying the Area of Institutional Controls.

### 1. Property Interest

Plaintiff argues that "at the time of defendant's taking John R. Sand had a property interest, via the lease, in the sand and gravel located on the property." Pl.'s Mot. at 12. Plaintiff states that "[t]he federal courts ... have consistently recognized lease interests as a compensable property interest if taken by the government." *Id.* at 11. Defendant argues that "[p]laintiff owns at most a potential 'use' interest which has different historically-rooted expectations than a fee simple interest." Motion for Leave of Court to File Supplemental Brief and Supplemental Brief in Support of Defendant's Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment (Def.'s Supp.) at 4. Defendant further argues that, because plaintiff did not have the necessary Soil Removal Permit from the Township of Metamora at the time of the alleged taking, "plaintiff cannot establish a compensable property right to mine by virtue of its lease." Def.'s Supp. at 6. Plaintiff argues that it had "a valid non-conforming use as to the Metamora Township zoning ordinance."[7] Plain-

---

**6.** In addressing the strength of the background principles asserted by a defendant, a Michigan court stated that a state constitutional provision declaring natural resource conservation " 'to be of paramount public concern' " and instructing the legislature to provide for the protection of natural resources is not a principle of state nuisance and property law. *K & K Constr., Inc. v. Dep't of Natural Res.,* 217 Mich.App. 56, 551 N.W.2d 413, 417 (1996) (quoting Mich. Const. art. IV, § 52), *rev'd on other grounds,* 456 Mich. 570, 575 N.W.2d 531 (1998). The Michigan court also noted that "the generalized invocation of public interests in the ... Legislature's declarations in the [Wetlands Protection Act] and the Michigan Environmental Protection Act do not constitute background principles of nuisance and property law sufficient to prohibit the use of plaintiffs' land without just compensation." *Id.* (citation omitted). Neither party has cited a Michigan case with facts closely analogous to this case. For an example of a case finding that state nuisance law prohibited a landowner from engaging in activities that would spread radioactive contamination, which thereby disposed of the takings issue, see *State v. The Mill,* 887 P.2d

993, 1002 (Colo.1994). If no Michigan case with closely analogous facts exists, the parties should cite to analogous authorities from other jurisdictions with an explanation of why such authorities would be likely to be persuasive to a Michigan court.

**7.** To support this argument, plaintiff refers the court to an earlier brief. *See* Pl.'s Supp. Resp. at 5 (citing "Plaintiff's response to defendant's cross-motion p. 14"). In the earlier brief, plaintiff states that Metamora Township "recognized the plaintiff's mining operations predated the adoption of the Metamora Township zoning ordinance in 1987." Pl.'s Resp. at 14. Plaintiff then refers the court to a 1993 letter from Metamora Township's attorney to plaintiff. *See id.* (citing Pl.'s Resp. Ex. 6 (Letter from Howell to Evatz of 5/7/93)). This letter, however, is not relevant to the present dispute because the letter only concedes that, as of 1987, plaintiff "had an existing nonconforming use for a gravel pit on the [Metamora Landfill] site at the time of adoption of [the 1987] Zoning Ordinance." *Id.* Ex. 6 (Letter from Howell to Evatz of 5/7/93, at 1). Defendant's

tiff's Response to Defendant's Supplemental Brief in Support of Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment (Pl.'s Supp. Resp.) at 5.

The court must first decide the date the alleged taking occurred because the scope of plaintiff's property interest, that is, what was "taken," is determined at the moment prior to that date.[8] Although both parties agree that the alleged taking occurred in May 1998, Def.'s Supp. at 2; Pl.'s Supp. Resp. at 2, the date of first accrual of a takings claim is a matter of law, *see Banks v. United States*, 314 F.3d 1304, 1307–08 (Fed.Cir.2003) (stating that the appellate court reviews matters of law de novo and applying that standard to the trial court's decision to dismiss a takings claim as time-barred, which requires analysis of when the claim first accrued), which is for the court to decide.

In the court's prior opinion in this case, the court did not decide exactly when plaintiff's claim first accrued, only that plaintiff's claim was not time-barred because it had accrued within six years before plaintiff filed its complaint. *John R. Sand & Gravel Co.*, 57 Fed. Cl. at 193. The court found that plaintiff "had access to much of the [leased property] and was able to make valuable use of it, including the Area of Institutional Controls" until December 1996, when the EPA issued an Administrative Order prohibiting plaintiff from interfering with the Area of Institutional Controls. *Id.* at 192; *see also* Supp. Compl. Ex. 2 (Administrative Order Directing Compliance with Request for Access in *In re Metamora Landfill Site*, No. 97–C–379 (EPA Dec. 18, 1996)). The Administrative Order prohibited plaintiff from "engaging in any excavating, grading, filling, drilling, mining, storage, disposal or other construction or development" in the Area of Institutional

Controls. Supp. Compl. Ex. 2 ¶ 6(g) (Administrative Order Directing Compliance with Request for Access in *In re Metamora Landfill Site*, No. 97–C–379 (EPA Dec. 18, 1996)). Plaintiff was effectively barred from mining within the Area of Institutional Controls. The Administrative Order took effect on January 8, 1997. *See* Supp. Compl. Ex. 2, at 10–11 (stating that the Administrative Order would take effect twenty-one days after the date the Order was signed, which was December 18, 1996). After the issuance of the Administrative Order, plaintiff did not mine sand and gravel within the Area of Institutional Controls, although it had been doing so prior to the issuance of the order. Pl.'s Mot. Ex. 1 ¶¶ 7–9 (Second Declaration of Edward W. Evatz, Jr.). Because paragraph one of plaintiff's lease limits plaintiff's use of the property to sand and gravel mining and related activities, Supp. Compl. Ex. 1 ¶ 1 (lease), the Administrative Order bars plaintiff from the Area of Institutional Controls. For the purpose of considering the pending motions, the court treats plaintiff's taking claim as having accrued on January 8, 1997, the date the Administrative Order took effect.

 Turning to the scope of plaintiff's property interest on January 8, 1997, plaintiff is correct that the "the settled rule in Michigan [is] that a leasehold, and rights derived from a leasehold, constitute 'property,' for the taking of which just compensation must be made or secured." *Lookholder v. Ziegler*, 354 Mich. 28, 91 N.W.2d 834, 838 (1958); *see also United Coin Meter Co. v. Gibson*, 109 Mich.App. 652, 311 N.W.2d 442, 444 (1981) (stating that a lease agreement transfers to the tenant a possessory estate (citing *Nowlin Lumber Co. v. Wilson*, 119 Mich. 406, 78 N.W. 338 (1899))); *2 Powell on Real Property, supra*, § 16.02[3][a], at 16–13 (Michael

argument is based on plaintiff's failure to obtain a permit under the Soil Removal Ordinance passed in 1996. *See* Def.'s Supp. at 5 ("At least since 1996, [p]laintiff has been required to obtain a Soil Removal Permit from Metamora Township in order to legally mine the property."). Neither party provided the court with a copy of the 1987 Zoning Ordinance.

8. Plaintiff and defendant agree that the appropriate date from which to evaluate the scope of

plaintiff's property interest is the date of the alleged taking. *See* Def.'s Supp. at 2 ("[T]he Court must evaluate the scope of [p]laintiff's state law property rights pursuant to its mining lease as of the time the exclusion alleged to have caused the physical taking occurred."); Pl.'s Supp. Resp. at 1 ("[T]he date of the taking by the United States is the relevant date for evaluating the nature and scope of plaintiff's property interest.").

Allan Wolf ed., 2003) ("A lease transfers an 'estate' to the tenant, which gives the tenant a 'possessory' interest in the premises."). Under a lease, a tenant obtains both a right to possess and a right to "exclusive use" of the property, subject to the terms of the lease. *United Coin Meter Co.*, 311 N.W.2d at 444.

■■■ Defendant does not dispute that plaintiff possesses a leasehold or that plaintiff's lease interest is possessory. Defendant's characterization of plaintiff's property interest as a "potential use" interest is correct only insofar as plaintiff's exclusive use of the leased property is subject to the terms in the lease. Paragraph one of the lease limits plaintiff's use of the property to sand and gravel mining and related activities. *See* Supp. Compl. Ex. 1 ¶ 1 (lease). Paragraph seven of the lease requires plaintiff "to operate its mining operations according to the Zoning Ordinance for the Township of Metamora and according to all conditions as required in a Gravel and Sand Mining Permit as issued by the Township of Metamora, Lapeer County, Michigan." *Id.* ¶ 7. The only condition under which the lease provides for automatic cancellation is if plaintiff "fail[s] to remove any sand or stone from the premises and fail[s] to make payment ... for a twelve (12) month period." *Id.* ¶ 9.[9]

In 1996, the Metamora Township passed the Soil Removal Ordinance, which makes it "unlawful for any person to remove any earth material [from] any premises without a permit from the Township Board." Def.'s Supp. Attach. B (Metamora, Mich. Ordinance No. 34 (May 13, 1996)). Plaintiff did not initially comply with the Ordinance, *see id.* Attach. A (Letter from Nolan to Evatz of 10/8/96, at

1, requesting plaintiff to "bring [its] operations into compliance with Ordinance 34"), and sought to enjoin enforcement of the Ordinance in a state court, *see id.* Attach. C (*John R. Sand & Gravel Co. v. Metamora Township*, No. 97–023876–CE(H) (Mich.Cir. Ct. July 13, 1999)); *see also* Pl.'s Resp. at 15 ("To clarify the regulation of its sand and gravel mining under Ordinance 34, plaintiff sued ...."). The state court entered a consent judgment on July 13, 1999. Def.'s Supp. Attach. C. As of January 8, 1997, the relevant time for assessing plaintiff's property interest, there was no state court decision regarding whether the Soil Removal Ordinance applied to plaintiff. It is possible that plaintiff had a valid nonconforming use,[10] as plaintiff argues it did. Pl.'s Supp. Resp. at 5. However, because the parties did not directly address the scope of plaintiff's property interest as of January 8, 1997, the court does not draw any conclusions regarding the scope of plaintiff's property interest the moment prior to the alleged taking.

2. Michigan Property and Nuisance Law

The court now examines whether "background principles of [Michigan's] law of property and nuisance" inhere in plaintiff's title. *See Lucas*, 505 U.S. at 1029, 112 S.Ct. 2886. Defendant argues that "the government's remedial activities here were necessary to abate a nuisance and therefore ... must be seen as 'falling squarely within the nuisance exception.'" Def.'s Cross–Mot. at 17 (quoting *Hendler v. United States*, 36 Fed.Cl. at 586). Defendant identifies several potential nuisances: (1) groundwater pollution, *id.* at 22–25; (2) production of odors from the excavation of rotting garbage, Def.'s Supp. at 8; (3) violation of a public health, safety or

---

9. The lease also affords the landlord "the privilege of cancellation prior to the expiration of the fifty (50) year period by service of a thirty (30) day written notice to such effect." Supp. Compl. Ex. 1 ¶ 8 (lease). Neither party has addressed any impact this provision may have on plaintiff's property interest.

10. Under Michigan law,

[t]he lawful use of ... land or a premise as existing and lawful at the time of enactment of a zoning ordinance, or, in the case of an amendment of an ordinance, then at the time of the amendment, may be continued although

the use does not conform with the ordinance or amendment.

Mich. Comp. Laws Ann. § 125.286(1) (West 1997). To establish the existence of a nonconforming use, a party "must be able to show such established use in existence at the time of enactment of the ordinance." *Fredal v. Forster*, 9 Mich.App. 215, 156 N.W.2d 606, 612–13 (1967). To qualify as an "established use," the use must be substantial, which is "a qualitative appraisal of the extent of the use and ... is concerned with the timing of the use relative to the time of enactment of the ordinance." *Id.* at 613.

welfare statute, *id.* at 8–9; (4) violation of the Michigan Water Resources Commission Act, Def.'s Cross–Mot. 21–22; and (5) failure to obtain the necessary permits, Def.'s Supp. at 5–7. The court denies, without prejudice, defendant's cross-motion for summary judgment as to the existence of each of these alleged nuisances.

a. Groundwater Pollution

Defendant argues that, by mining in the Area of Institutional Controls, plaintiff would have exacerbated already-existing groundwater contamination or caused groundwater contamination to occur. *See* Def.'s Cross–Mot. at 24 (arguing that it "would be impossible to mine [in the Area of Institutional Controls] without causing or exacerbating groundwater contamination in the area"). Defendant suggests that plaintiff's mining would contaminate the groundwater because plaintiff would have to "dig[ ] through tens of thousands of drums laden with hazardous chemicals (and hundreds of thousands of cubic yards of landfilled waste mixed drums) in order to extract what would undoubtedly have been contaminated sand and gravel." Def.'s Reply at 13. This, according to defendant, could "caus[e] a collapse of the landfill, loosen[ ] up the overlying soils in a manner which would allow greater rainwater influx, [or] accelerat[e] and exacerbat[e] the migration of contamination." Def.'s Cross–Mot. at 24. Plaintiff argues that defendant bases its argument on "incorrect assumptions" and that plaintiff's mining would not have caused a nuisance. Pl.'s Resp. at 15. Both parties cite the EPA's 1986 Record of Decision (1986 ROD) and 1990 Record of Decision (1990 ROD) in support of their arguments. *See* Def.'s Cross–Mot. at 22–23; Def.'s Reply at 14; Pl.'s Resp. at 15–16.

Under Michigan law, "[t]he pollution of ground water may constitute a public or private nuisance." *Adkins v. Thomas Solvent Co.*, 440 Mich. 293, 487 N.W.2d 715, 720 (1992) (citing Restatement (Second) of Torts § 832 (1979)). This legal statement, however, does not define all pollution of groundwater to be a nuisance; it merely identifies an issue for further investigation. To constitute a public or private nuisance, the groundwater

pollution must satisfy the elements of nuisance liability. *See* Restatement (Second) of Torts § 832 ("An invasion of one's interest in the use and enjoyment of land or water resulting from another's pollution of ... ground waters ... may constitute a nuisance under the rules stated in §§ 821A–831 [which discuss public and private nuisance and define the elements of liability] ....").

"A private nuisance is a nontrespassory invasion of another's interest in the private use and enjoyment of land." *Adkins*, 487 N.W.2d at 719 (citing Restatement (Second) of Torts § 821D). The Michigan Supreme Court stated that,

an actor is subject to liability for private nuisance ... if (a) the other has property rights and privileges in respect to the use or enjoyment interfered with, (b) the invasion results in significant harm[,] (c) the actor's conduct is the legal cause of the invasion, and (d) the invasion is either (i) intentional and unreasonable, or (ii) unintentional and otherwise actionable under the rules governing liability for negligent, reckless, or ultrahazardous conduct.

*Id.* at 720 (citing Restatement (Second) of Torts §§ 821D–F).

"A public nuisance is an unreasonable interference with a common right enjoyed by the general public." *Cloverleaf Car Co. v. Phillips Petroleum Co.*, 213 Mich.App. 186, 540 N.W.2d 297, 300 (1995). Under Michigan law, " 'unreasonable interference' includes conduct that (1) significantly interferes with the public's health, safety, peace, comfort, or convenience, (2) is proscribed by law, or (3) is known or should have been known by the actor to be of a continuing nature that produces a permanent or long-lasting significant effect on these rights." *Id.*

Under theories of either private or public nuisance, a party claiming that a nuisance exists must show that the injury or harm is reasonably certain to occur:

[E]quity will not enjoin an injury which is merely anticipated nor interfere where an apprehended nuisance is doubtful, contingent, conjectural or problematical. A bare possibility of nuisance or a mere fear or apprehension that injury will result is not

enough. On the other hand, an injunction may issue to prevent a threatened or anticipated nuisance which will necessarily result from the contemplated act, where the nuisance is a practically certain or strongly probable result or a natural or inevitable consequence.

*Falkner v. Brookfield,* 368 Mich. 17, 117 N.W.2d 125, 128 (1962); *see also Plassey v. S. Loewenstein & Son,* 330 Mich. 525, 48 N.W.2d 126, 128 (1951) ("Equity, as a rule, will not interfere in advance of the creation of a nuisance where the injury is doubtful or contingent, and anticipated merely from the use to which the property is to be put."); *Foster v. County of Genesee,* 329 Mich. 665, 46 N.W.2d 426, 429 (1951) (stating that evidence that a "proposed use of property may constitute a possible threatened nuisance ... do[es] not entitle plaintiffs to an injunction" because "equity will not interfere in advance of creation of nuisance, where injury is doubtful or contingent, and anticipated merely from use to which property is to be put"); *Ovens, LLC v. Quality Acquisitions, LLC,* Nos. 236800, 238885, 2003 WL 22442786, at *8 (Mich.Ct.App. Oct.28, 2003) ("Recovery for nuisance ... traditionally required proof of actual and substantial injury.").[11] Because defendant alleges that plaintiff's mining in the Area of Institutional Controls would have caused a nuisance, Def.'s Cross-Mot. at 19, defendant must show that a private or public nuisance either already existed or that a nuisance from mining is "practically certain or strongly probable result or a natural or inevitable consequence." *Falkner,* 117 N.W.2d at 128. And, in either case, defendant must demonstrate that Michigan law would have allowed the government to abate the nuisance in the way that it did.

It is clear from the evidence in the record that, at least since 1990, a groundwater contaminant plume has extended beyond the northern boundary of the Metamora Landfill site:

The upper aquifer at the site has been contaminated by chemicals which have migrated from the drum areas and the landfill. The horizontal extent of the groundwater contamination extends at least 550 feet from the northern boundary of the landfill. Since the furthest down gradient wells are contaminated, a model was run to estimate the extent of the plume. The numerical model estimated that contaminated groundwater may extend 2,500 to 3,500 feet north of the northern landfill boundary.

Def.'s Cross-Mot. Ex. 8, at 4 (1990 ROD). The EPA classifies the water in the upper, or shallow, aquifer as "groundwater potentially used as drinking water." *Id.* Ex. 8, at 10.[12] The EPA detected "34 organic chemicals and 12 inorganic chemicals ... in the shallow aquifer." *Id.* Ex. 8, at 5. In the 1990 ROD, the EPA concluded that the then-current risk to human health from ingestion of contaminated water was "acceptable." *See id.* Ex. 8, at 7 ("EPA conducted a site-specific baseline risk assessment to characterize the current threat to human health from ingestion of contaminated groundwater .... The results of the risk assessment establish acceptable levels for the contaminants of concern in groundwater."). However, the EPA found that, in the future, "[t]he ingestion of contaminated groundwater ... pose[d] a potential risk to human health." *Id.* Ex. 8, at 8. "Lifetime incremental cancer risks exceed the upper bound of the U.S. EPA target range for both [the most-probable case and the realistic worse-case] scenarios." *Id.* Ex. 8, at 8.

The EPA makes it clear in the 1990 ROD that groundwater contamination posed a future threat to human health. Whether this threat would rise to the level of creating a nuisance under Michigan law is not clear, and is not made clear by the parties because they

---

11. The court notes that while Michigan Court Rules do not prohibit the citation of unpublished opinions, "[a]n unpublished opinion is not precedentially binding under the rule of stare decisis." Mich. Ct. R. 7.215(C)(1). The court relies on published Michigan cases as binding precedent and cites unpublished cases only to illustrate the court's discussions of the issues in the case.

12. The bedrock aquifer is the "primary aquifer for domestic wells in the Metamora area." Def.'s Cross-Mot. Ex. 8, at 1 (1990 ROD). The EPA found that the bedrock aquifer "exhibited no signs of site-related contamination." *Id.* Ex. 8, at 5.

do not tie the above-stated facts to the legal standard for finding a common-law nuisance. For example, neither party discusses the probability that the contaminant plume would reach drinking wells, which could indicate that the requisite harm existed. It is also unclear whether, if the groundwater contamination does constitute a nuisance, the government could have abated the nuisance under Michigan law in the manner that it did. For these reasons, defendant's cross-motion for summary judgment on this issue is denied.

### b. Production of Odors from the Excavation of Rotting Garbage

Defendant argues that "[t]he production of sickening odors from exposed garbage is a nuisance per se" and that "any mining within the [Area of Institutional Controls] would involve the excavation of huge amounts of buried, rotting garbage, which ... would create a terrible odor." Def.'s Supp. at 8. Defendant cites the trial testimony of Edward Evatz, the president of John R. Sand & Gravel Co., in *County Transfer Station, Inc. v. John R. Sand & Gravel Co.*, No. 99–026484–CH (Mich. 40th Cir.Ct. Feb. 8, 2001), in which Mr. Evatz states that John R. Sand & Gravel Co. had to stop mining in the Area of Institutional Controls because it " 'started hitting garbage.' " Def.'s Supp. at 8 (quoting Def.'s Supp. Attach. I (trial testimony)). Plaintiff argues that "[d]efendant's entire argument is based on the false premise that excavating any cubic yard in the Area of Institutional Controls will necessarily excavate garbage." Pl.'s Supp. Resp. at 10.

In *Trowbridge v. City of Lansing*, the Michigan Supreme Court held that garbage that is "malodorous" is a nuisance per se. 237 Mich. 402, 212 N.W. 73, 74 (1927). In finding a nuisance, the lower court heard testimony that established that, within a one-and-a-half mile radius of the garbage site, "and according to the direction of wind, plaintiffs suffered, in their homes and about their premises, physical discomfort from the sickening, nauseating, and offensive odors." *Id.* In deciding that the defendant had not adequately abated the nuisance, the Michigan Supreme Court had before it testimony from twelve defense witnesses whose testimony demonstrated an "element of confession of the presence of ... odors" after the abatement efforts. *Id.* at 75. Forty-four witnesses for the plaintiffs testified to

> the prevalence and existence of odors in their homes and about their premises from the garbage and the piggery continuing during the test period, which they characterized as "sickening," "nauseating," "rotten," "awfully offensive," etc. ... They testified, also, ... of personal and physical discomfort and annoyance, and that their homes had been made and were less desirable.

*Id.* While garbage odors are a nuisance per se under Michigan law, the Michigan Supreme Court's analysis makes clear that evidence of the odor is required before the court will find a nuisance.

Defendant concludes from the statement that plaintiff "started hitting garbage" when mining in the Area of Institutional Controls that the exposure of the garbage would have produced "a terrible odor." Whether or not mining within the Area of Institutional Controls necessarily would have excavated garbage, an issue on which the court expresses no opinion, there is insufficient evidence regarding the existence or extent of the alleged odor of the garbage for the court to find that plaintiff's mining would have caused a nuisance. Accordingly, defendant's cross-motion for summary judgment on this issue is denied.

### c. Violation of a Public Health, Safety or Welfare Statute

Defendant argues that "the violation of a statute that has been 'enacted to preserve the public health, safety and welfare' constitutes a public nuisance." Def.'s Supp. at 8 (quoting *Sew Indus., Inc. v. Florence I, Inc.*, No. 191762, 1997 WL 33339889, at *3 (Mich. Ct.App. Nov.4, 1997)). In *Sew Industries*, the case defendant cites for this proposition, the court stated that violation of a public health, safety or welfare statute is a type of unreasonable interference with a common right that could constitute a public nuisance. *Sew Indus.*, 1997 WL 33339889, at *3. Although the court cannot rely on *Sew Indus-*

*tries* as precedent, *see* Mich. Ct. R. 7.215(C)(1) ("An unpublished opinion is not precedentially binding under the rule of stare decisis."), published Michigan decisions confirm that an activity may be found to be a nuisance if it violates a law. *See Att'y Gen. ex rel. Mich. Bd. of Optometry v. Peterson,* 381 Mich. 445, 164 N.W.2d 43, 53 (1969) ("At common law, acts in violation of law constitute a public nuisance."); *Township of Garfield v. Young,* 348 Mich. 337, 82 N.W.2d 876, 878 (1957) (suggesting that a statute could denominate an activity a nuisance per se). However, Michigan case law suggests that the bare violation of a statute is not enough to declare an activity to be a nuisance. *See Adkins,* 487 N.W.2d at 725 ("Defendant's business is a lawful business, and the fact that violations of the law may have occurred on the property does not make the conduct of the business a nuisance in fact."). While "[h]arm to the public is presumed to flow from the violation of a valid statute enacted to preserve public health, safety and welfare," *Attorney Gen. ex rel. Mich. Bd. of Optometry v. Peterson,* 164 N.W.2d at 53, "factual support [is] required to prove nuisance; illegal conduct alone [is] not enough," *Adkins,* 487 N.W.2d at 725 n. 31. In fact, in the case defendant cites, the court found that "plaintiff ha[d] presented *sufficient evidence* to support a claim of public nuisance" because plaintiff "suffered a type of harm different from that of the general public" and plaintiff "present[ed] *sufficient evidence* to support a finding that defendants violated [the Michigan Environmental Response Act]." *Sew Indus.,* 1997 WL 33339889, at *3 (emphasis added).

Defendant argues that plaintiff's mining in the Area of Institutional Controls would have violated section 324.20107(a) of Michigan's Natural Resources and Environmental Protection Act, Mich. Comp. Laws Ann. §§ 324.101–.99904 (West 2003). Def.'s Supp. at 8–9. This provision provides: "A person who owns or operates property that he or she has knowledge is a facility [13] shall ... [u]ndertake measures as are necessary to prevent exacerbation of the existing contamination ... and allow for the intended use of the facility in a manner that protects public health and safety." Mich. Comp. Laws Ann. § 324.20107a(1)(a), (c). Defendant states, "Clearly, [p]laintiff's mining in the [Area of Institutional Controls], precisely because it is contaminated, would both exacerbate the existing contamination on the property and endanger public health and safety and would therefore constitute a public nuisance." Def.'s Supp. at 9.[14]

Based on defendant's argument regarding section 324.20107a(1), the court cannot find that plaintiff's mining would have created a nuisance. Defendant does not explain whether the Natural Resources and Environmental Protection Act is a health, safety or welfare statute, the violation of which could constitute a nuisance, whether the Metamora Landfill site is a "facility" under the statute or whether not mining in the Area of Institutional Controls is a measure that is "necessary to prevent exacerbation of the existing contamination." Even if violation of section 324.20107a(1) would constitute a nuisance, factual evidence of plaintiff's violation of the statute (or potential violation by mining in the Area of Institutional Controls) is required for the court to find that a nuisance

---

**13.** Section 324.20101 defines a "facility" as "any area, place, or property where a hazardous substance in excess of the concentrations which satisfy the requirements of section 20120a(1)(a) or (17) ... has been released, deposited, disposed of, or otherwise comes to be located." Mich. Comp. Laws Ann. § 324.20101(*o*). Section 20120a(1)(a) gives the Michigan Department of Environmental Quality the authority to "establish cleanup criteria" for residential facilities. § 324.20120a(1)(a). Section 20120a(17) states:

A remedial action plan that relies on categorical cleanup criteria developed pursuant to subsection (1) shall also consider other factors necessary to protect the public health, safety,

and welfare, and the environment as specified by the department, if the department determines based on data and existing information that such considerations are relevant to a specific facility. These factors include, but are not limited to, the protection of surface water quality and consideration of ecological risks if pertinent to the facility based on the requirements of R 299.5717 of the Michigan administrative code.

§ 324.20120a(17).

**14.** Plaintiff does not address section 324.20107a(1) of Michigan Compiled Laws in its briefs.

exists. Accordingly, defendant's cross-motion as the existence of a nuisance due to violation of a public health, safety or welfare statute is denied.

#### d. Violation of Michigan Water Resources Commission Act

Defendant argues that by mining within the Area of Institutional Controls, plaintiff would have violated the Michigan Water Resources Commission Act, Mich. Comp. Laws Ann. §§ 324.3101–.3119 (West 2003)(Act). *See* Def.'s Cross–Mot. at 3 (arguing that mining in the Area of Institutional Controls "would have violated ... Michigan's water pollution statute, M.C.L. § 323.6 (1929)").[15]

At the time of the alleged taking, January 1997, the Act provided:

(1) A person shall not directly or indirectly discharge into the waters of the state[16] a substance that is or may become injurious to any of the following:

(a) To the public health, safety, or welfare.

(b) To domestic, commercial, industrial, agricultural, recreational, or other uses that are being made or may be made of such waters.

. . . .

(4) A violation of this section is prima facie evidence of the existence of a public nuisance and in addition to the remedies provided for in this part may be abated according to law in an action brought by the attorney general in a court of competent jurisdiction.

Mich. Comp. Laws Ann. § 324.3109 (West 1997). The overall purpose of the Act was "to create a water resources commission to protect and conserve the water resources of the state." *Att'y Gen. v. John A. Biewer Co.*, 140 Mich.App. 1, 363 N.W.2d 712, 716 (1985). The Act "contains a comprehensive procedural and substantive framework for the elimination of water pollution." *White Lake Improvement Ass'n v. City of Whitehall*, 22 Mich.App. 262, 177 N.W.2d 473, 475 (1970).

Plaintiff argues that the Act is a permit system and, as such, the statute "[is] not a prohibition of conduct that rises to the level of a limitation on title," Pl.'s Resp. at 12, and "does not preclude any particular use of property," *id.* at 13. Plaintiff appears to be correct that the Act is a permitting system. *See S. Macomb Disposal Auth. v. Am. Ins. Co.*, 225 Mich.App. 635, 572 N.W.2d 686, 700 (1997) (stating that section 324.3109 "prohibits direct or indirect discharge of injurious substances into the state's waters without a permit"); *Petition of Lloyd & Donna Kernen on Homestead Estates Mobile Home Park*, 1995 WL 424391, at *14 (Mich. Dep't Natural Res. July 7, 1995) ("The Michigan Water Resources Commission Act ... prohibits discharge of pollutants into the waters of the State without a permit issued by the [Water Resources Commission]." (citation omitted)). Nevertheless, the Act also makes clear that a violation of its requirements is actionable as a nuisance. Section 324.3109 "expressly authorizes an action for public nuisance when a party violates its requirements."[17] *Clover-*

---

**15.** The Michigan Water Resources Commission Act was originally enacted in 1929 as the Stream Control Commission Act. *See* Joint Exhibit Showing 1929 Mich. Pub. Act 245, as amended, now Mich. Comp. Laws §§ 324.3101–.3133 (2003) (Jt.Ex.) Ex. 1 (Pub. Act No. 245 (1929)). The Act has subsequently gone through many revisions. *See White Lake Improvement Ass'n v. City of Whitehall*, 22 Mich.App. 262, 177 N.W.2d 473, 475 (1970) (stating that the Water Resources Commission Act was "[o]riginally enacted in 1929 and frequently amended"). In 1949, the Stream Control Commission Act became the Water Resources Commission Act and was renumbered as Mich. Comp. Laws §§ 323.1–12a. *See* Jt. Ex., Ex. 4 (Pub. Act No. 117 (1949)). In 1994, the Act was renumbered again and is currently contained in Mich. Comp. Laws §§ 324.3101–3119. *See id.* Ex. 23 (Pub. Act No. 451 (1994)). The court uses the version of the law in effect in January 1997, the date of the alleged taking. *See supra* Part II.C.1 (discussing the scope of plaintiff's property interest and deciding, for purposes of considering the present motions, that plaintiff's takings claim accrued on January 8, 1997).

**16.** In interpreting a prior version of this statute, Mich. Comp. Laws Ann. § 323.6 (West 1952), the Michigan Supreme Court in *L.A. Darling Co. v. Water Resources Commission* held that the statute applies to underground waters. 341 Mich. 654, 67 N.W.2d 890, 894 (1955).

**17.** The court also notes that a Michigan court, citing what is now section 324.3109, stated that "[t]he [Water Resources Commission Act] itself contemplates that existing common law remedies are not abolished." *White Lake Improvement Ass'n*, 177 N.W.2d at 481. The import of that observation, and its possible relevance to this case, remain to be examined.

*leaf Car Co.*, 540 N.W.2d at 302; *see also S. Macomb Disposal Auth.*, 572 N.W.2d at 700 ("Any discharge made without the necessary permit is prima facie evidence of the existence of a public nuisance . . . .").

The parties have not adequately addressed whether the Michigan Water Resources Commission Act is a sufficiently strong background principle of state nuisance law to ground a nuisance defense. In this connection, the court notes that the nuisance provision was added to the statute relatively recently, in 1965. *See* Jt. Ex., Ex. 5 (Pub. Act No. 328 (1965)). The court also notes that the statute does not designate a violation of the statute a nuisance per se. Instead, a violation is prima facie evidence of the existence of a nuisance. It is only on a showing that the Water Resources Commission Act is a background principle of Michigan property or nuisance law that the court can reach the factual issues regarding whether plaintiff would have violated the law by mining in the Area of Institutional Controls, that is, whether mining would cause the discharge of hazardous substances into the groundwater.

Assuming, without deciding, that section 324.3109 is a sufficiently strong principle of state nuisance law to ground a nuisance defense, under section 324.3109, a presumption of public nuisance cannot arise where a party "[does] not plead facts sufficient to raise a question of material fact concerning whether [a party] ha[s] violated the statute." *Cloverleaf Car Co.*, 540 N.W.2d at 302. In *Cloverleaf Car Co.*, the court found that there was no evidence that defendant violated the statute because there was "no evidence that any action by [the defendant] either directly or indirectly caused the discharge [of gasoline into the water supply]." *Id.* Factual evidence of the actual nuisance is required before a court will enjoin the nuisance. *See Conway v. Gampel*, 235 Mich. 511, 209 N.W. 562, 563 (1926) (stating that, even in a case where an activity is a nuisance per se, "a court of equity requires evidence of the fact of actual nuisance before it will enjoin"). Defendant has not developed evidence to support its allegation that plaintiff's mining within the Area of Institutional Controls had or would have "directly or indirectly dis-

charge[d] into the waters of the state" any hazardous substances. *See* Mich. Comp. Laws Ann. § 324.3109. This is a question of fact upon which the parties do not agree. *Compare* Def.'s Cross–Mot. at 22 ("If Plaintiff had mined in [the disposal area], contaminants would have been further spread or released into the groundwater.") *with* Pl.'s Resp. at 16 ("Neither EPA, the State of Michigan, Lapeer County nor Metamora Township ever asserted that [plaintiff's] mining could or would disturb any contamination . . . ."). For these reasons, defendant's cross-motion on this issue is denied.

**e. Failure to Obtain Necessary Permits**

Defendant argues that because "[p]laintiff did not possess the necessary permits from Metamora Township, Lapeer County, and the State of Michigan to allow it to mine sand and gravel . . . [p]laintiff's mining anywhere on the property, including in the [Area of Institutional Controls], constitutes an enjoinable nuisance under state law." Def.'s Supp. at 3. Defendant cites plaintiff's lack of a Soil Removal Permit from Metamora Township, a Soil Erosion and Sedimentation Control Permit from Lapeer County or a Groundwater Discharge Permit from the State of Michigan. *Id.* at 5–7.

As to the first two permits, plaintiff argues that it was simply not required to obtain them. *See* Pl.'s Supp. Resp. at 7–9. The court addressed plaintiff's alleged lack of a Soil Removal Permit from Metamora Township as it relates to defining the scope of plaintiff's property interest in an earlier section. *See supra* Part II.C.1. Because, at the time of the alleged taking, January 1997, litigation was pending in state court regarding whether the Soil Removal Ordinance applied to plaintiff and because the parties did not address the scope of plaintiff's property interest as of January 1997, the court drew no conclusions as to whether the scope of plaintiff's property interest was affected by the status of the permit. Similarly, here, because of the uncertainty surrounding the applicability of the Soil Removal Ordinance to plaintiff, the court does not decide whether plaintiff's violation of the Ordinance would constitute a nuisance. Nor does the court

reach a conclusion with respect to the Soil Erosion and Sedimentation Control Permit from Lapeer County because, at the time of the alleged taking, the applicability of the ordinance to plaintiff was contested. Pl.'s Supp. Resp. at 9.

With respect to the Groundwater Discharge Permit, it appears that a permit for discharge of water from plaintiff's gravel washing is required by the State of Michigan. *See* Def.'s Supp. Attach. G (Letter from Janiczek to Evatz of 9/28/94, at 1, stating that "[i]f [plaintiff] intend[s] to discharge the water used in [its] gravel process to the groundwater, it will be necessary for [plaintiff] to secure a groundwater discharge permit prior to discharging to groundwater"). Alternatively, it appears that a party may obtain an exemption from the permitting requirement. *See* Pl.'s Supp. Resp. Ex. 7 (Letter from Lee to Evatz of 11/28/94, at 1, informing plaintiff that it did not meet the requirements of the Groundwater Discharge Permit exemption). Plaintiff argues that the permitting requirement applies only "to plaintiff's gravel washing operation, which occurs outside the Area of Institutional Controls, and does not apply to any mining that would occur in the Area of Institutional Controls." *Id.* at 9. Assuming that plaintiff did not have a Groundwater Discharge Permit at the time of the alleged taking, and that discharging water without a permit is a nuisance, it is difficult to see how the government could effectively abate a nuisance occurring outside the Area of Institutional Controls by preventing plaintiff from mining inside the Area of Institutional Controls. For the foregoing reasons, defendant's cross-motion that plaintiff's failure to obtain the necessary permits "constitutes an enjoinable nuisance" is denied.

### 3. Power to Abate Nuisances

Once a court decides that a particular use of land constitutes a public nuisance, the question of the scope of the state court's power to abate the nuisance under state law arises because the government's actions that are alleged to constitute the taking must "do no more than duplicate the result that could have been achieved in the courts-by adjacent landowners (or other uniquely affected persons) under the State's law of private nuisance, or by the State under its complementary power to abate nuisances that affect the public generally, or otherwise." *Lucas,* 505 U.S. at 1029, 112 S.Ct. 2886. Because the court denies defendant's cross-motion regarding the existence of a nuisance, it does not reach the question of the allowable scope of the nuisance abatement.

A central dispute of the parties is whether, in abating a nuisance, the government may physically occupy another's property. *See* Pl.'s Resp. at 17 ("Neither the government nor neighboring landowners has a right under Michigan law to occupy ... property to remedy an alleged nuisance"); Def.'s Supp. at 10 ("[P]hysical ouster *is* allowed in order to abate certain nuisances."). Defendant also argues that this dispute is "irrelevant" because "the nuisance exception does not look to whether nuisance and property law principles would have allowed Defendant to occupy the land, but instead, addresses the question of whether nuisance and property law principles could have been invoked to prevent Plaintiff from exercising the property rights it claims were taken." Def.'s Reply at 11–12. While defendant's point (that takings law addresses the loss of only those property interests a plaintiff in fact has, which here are rights of use under a lease) is correct, it is still appropriate for the court to examine the scope of the abatement that would have been allowed by state law because the government can "do no more than duplicate the result that could have been achieved in the courts." *Lucas,* 505 U.S. at 1029, 112 S.Ct. 2886.

Defendant also argues, citing Michigan Compiled Laws section 333.2455, that "Michigan law grants the State, local units of government, and the general public broad powers to abate conduct that is detrimental to public health or the environment." Def.'s Supp. at 9. The cited statute reads: "A local health department or the department may issue an order to avoid, correct, or remove, at the owner's expense, a building or condition which violates health laws or which the local health officer or director reasonably believes to be a nuisance, unsanitary condition, or

cause of illness." Mich. Comp. Laws Ann. § 333.2455(1) (1997). The statute continues: "A court, upon a finding that a violation or nuisance may be injurious to the public health, may order the removal, abatement, or destruction of the violation or nuisance . . . ." § 333.2455(4). Plaintiff argues, without citation, that this statute "relates to unsanitary buildings." Pl.'s Supp. Resp. at 12. While the court does not here address whether this statute would apply to the facts of this case, the court does note that a Michigan court adopted the statement of a district health department that, under section 333.2455, a district health department has the authority " 'to remove dangerous buildings.' " *Jamieson v. Luce–Mackinac–Alger–Schoolcraft Dist. Health Dep't,* 198 Mich.App. 103, 497 N.W.2d 551, 555 (1993).

The court notes that under Michigan law, the state has broad police power to abate public nuisances:

> "The police power is universally conceded to include everything essential to the public safety, health, and morals, and to justify the destruction and abatement by summary proceedings of whatever may be regarded as a public nuisance. Under this power it has been held that the state may order the destruction of a house falling to decay, or otherwise endangering the lives of passers-by; the demolition of such as are in the path of a conflagration; the slaughter of diseased cattle; [and] the destruction of decayed or unwholesome food . . . ."

*Osborn v. Charlevoix Circuit Judge,* 114 Mich. 655, 72 N.W. 982, 985 (1897) (quoting *Lawton v. Steele,* 152 U.S. 133, 136, 14 S.Ct. 499, 38 L.Ed. 385 (1894)). However, the state's power to abate nuisances is not without limit. The Michigan Supreme Court has repeatedly stated that, if a nuisance arises out of the operation of a legitimate business, the nuisance should be abated in a way that does not completely destroy the business. *See Rohan v. Detroit Racing Ass'n,* 314 Mich. 326, 22 N.W.2d 433, 446 (1946) (" 'If a nuisance is private and arises out of a particular manner of operating a legitimate business, the court will do no more than point to the nuisance and decree adoption of methods

calculated to eliminate injurious features.' "); *Smith v. City of Ann Arbor,* 303 Mich. 476, 6 N.W.2d 752, 756 (1942) ("Where it is possible to eliminate the objectionable [f]eatures which infringe upon the ordinary rights of others, equity may so decree instead of compelling an abatement of the entire business."); *Perry Mount Park Cemetery Ass'n v. Netzel,* 274 Mich. 97, 264 N.W. 303, 303 (1936) (finding that a permanent injunction against operation of defendant's business went "too far" because "[i]t strikes down defendant's business" and stating that "[o]ffensive use of defendant's premises can be prevented by reasonable requirements"); *Adams v. Kalamazoo Ice & Fuel Co.,* 245 Mich. 261, 222 N.W. 86, 87 (1928) ("If a nuisance is private and arises out of a particular manner of operating a legitimate business, the court will do no more than point to the nuisance and decree adoption of methods calculated to eliminate injurious features."); *see also Norton Shores v. Carr,* 81 Mich.App. 715, 265 N.W.2d 802, 806 (1978) ("It is the policy of our courts . . . to tailor the remedy to the problem, to abate the nuisance without completely destroying the business in which the nuisance originates."). In general, "[i]n fashioning ways to abate a nuisance, the remedy should be tailored to meet the problem." *Att'y Gen. v. John A. Biewer Co.,* 363 N.W.2d at 719.

The court recognizes that it must closely examine state law "to determine if . . . there [is] a property right that could be violated." *McKay,* 199 F.3d at 1381. The court must also have sufficient facts in front of it regarding the existence of a nuisance before it decides that a nuisance exists because the question of whether an activity constitutes a nuisance is one of fact. *See Township of Garfield v. Young,* 82 N.W.2d at 879 (analyzing a public nuisance claim); *see also Att'y Gen. ex rel. Emmons v. City of Grand Rapids,* 175 Mich. 503, 141 N.W. 890, 893 (1913) (stating, in a public nuisance case, that "[t]he case presents largely a question of fact . . . whether the proof makes out . . . a nuisance"). Because the legal arguments and factual evidence regarding background principles of Michigan property and nuisance law need to be further developed and because disputed issues of material fact exist, the

court denies defendant's cross-motion for summary judgment with respect to its background principles of state property and nuisance law defense.

### D. Party to Whom the Alleged Taking is Attributable

Defendant argues that it should be granted summary judgment because "the alleged taking of [p]laintiff's property interest, if any, was attributable to the actions of [p]laintiff's lessor[s] in (1) placing the contamination or allowing the contamination to be placed on the property, and (2) consenting to entry by the EPA and its agents to perform investigatory and remedial activities." Def.'s Reply at 17. Thus, defendant argues, "[t]o the extent the landowner's consent to the activities of the United States has infringed on rights previously granted under John R. Sand's lease, John R. Sand's cause of action is against the lessor[s], not the United States." Def.'s Resp. at 27. Plaintiff argues that under applicable law, plaintiff could have cleaned up the site itself and sued to recover the costs, which would have allowed plaintiff to retain access to the site. Pl.'s Resp. at 20. Plaintiff also argues that its land was taken by the EPA's, not plaintiff's lessors', choice of remedial action. Pl.'s Resp. at 20–21. Defendant replies that "[p]laintiff cannot challenge EPA's remedy selection in this court, for jurisdictional reasons." Def.'s Reply at 18.

The lease between plaintiff and plaintiffs' lessors contains a covenant of quiet enjoyment. *See* Supp. Compl. Ex. 1 ¶ 5 ("The parties of the first part . . . warrant and covenant that the second part shall have quiet and peaceful possession [of the leased property]."). Plaintiff acknowledges that it has a potential claim against its lessors for breach of the covenant of quiet enjoyment arising out of the conduct at issue here. *See* Transcript of Oral Argument held on Feb. 6, 2004, at 27 (statement by plaintiff that one potential claim it has "is against the landlord for a breach of paragraph five of the lease, the covenant of quiet enjoyment"). Plaintiff

also states that it has potential claims against the potentially responsible parties and the United States. *Id.* at 27–28. Because defendant fails to provide citation to and analysis of any authority holding, or even suggesting, that, in this type of situation, the *only* cause of action available to plaintiff is against its lessors, defendant's cross-motion must be denied.

### III. Conclusion

For the foregoing reasons, defendant's cross-motion for summary judgment is GRANTED with respect to defendant's argument that the Supreme Court's articulation in *Lucas* of the background principles of state property and nuisance exception to takings liability applies to physical takings. The remainder of defendant's cross-motion for summary judgment and plaintiff's motion for summary judgment are DENIED.[18] The denials of both plaintiff's and defendant's motions are without prejudice to the right of the parties or either of them to assert the same or similar arguments after further proceedings to develop the record in the case.

IT IS SO ORDERED.

---

18. The court DENIES, without prejudice, the aspects of plaintiff's motion for summary judgment that address lateral and subjacent support

and awaits further development of the record on these issues.